**McCREERY ANGUS FARMS, a partnership, Mason City, Illinois, et al., Plaintiffs,**

**v.**

**AMERICAN ANGUS ASSOCIATION, a Corporation, St. Joseph, Missouri, Defendants.**

**No. S–Civ–73–224.**

United States District Court, S. D. Illinois, S. D.

Feb. 15, 1974.

Preliminary Injunction Amended March 6, 1974.

---

Sorling, Catron & Hardin (Thos. L. Cochran and Stephen A. Tagge), Springfield, Ill., Arnold & Porter (Tom Scheuneman and Irvin B. Nathan), Washington, D. C., for plaintiffs.

Patrick Cadigan, Gillespie, Burke & Gillespie, Springfield, Ill., R. A. Brown and John P. Beihl, of Brown, Douglas & Brown, St. Joseph, Mo., Blackwell, Sanders, Matheny, Weary & Lombardi (Thomas W. Wagstaff and Dennis P. Wilbert), Kansas City, Mo., for defendants.

## MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

HARLINGTON WOOD, Jr., District Judge.

In a preliminary way, this case involves an internal dispute of a private association, the American Angus Association, a not for profit organization. Plaintiffs, successful purebred Black Aberdeen Angus breeders, are indefinitely suspended members for allegedly failing to obey an Association rule relating to blood typing, and of one of its animals in particular. The Plaintiffs have in effect been put out of business by the Association's action, a group boycott. But there is more to this story.

The function of this Court is limited as it does not intend to sit generally as a Court of Review as to the merits of the Association's actions nor to substitute its judgment as to the merits of the allegations. That is purely Association business.

That does not mean, however, in circumstances as will be seen to exist in this case, that this Association is free from all judicial interference in its treatment of its own members.

It must be recognized that this Association, dedicated to the development of purebred cattle of a particular, valuable and outstanding type, performs an important service not only to its members, but it also involves strong elements of public interest. Similar associations for other breeds of animals have likewise helped to advance the quality of American livestock.

Some of the associations have competing associations, but the American Angus Association does not. It is a complete and absolute monopoly. Purebred Black Aberdeen Angus is big business, but a person is not in the purebred Black Aberdeen Angus business in any degree unless he is a member in good standing of this Association. This Association holds the reputations and the livelihood of its members within its absolute grasp. Such an Association admittedly must have the power to police itself and its members to accomplish its legitimate purposes. Therefore, the Association argues that, "If it cannot enforce its rules, the Association cannot serve its purposes and might as well fold up." That is true as far as it goes, but there is more to it than that as can be seen in the circumstances of this case. This is not a local social club, but an association of immense power and importance.

With that power and prestige, which the Association has developed over the years and no doubt deserves, goes an equal responsibility to clearly define and to use that power fairly and in accordance with at least the minimum requirements of due process.

This does not imply that the same technical judicial standards as exist in Court trials must be applied to Association rules and hearings, but it does mean that associations of this size and power must adhere to certain basic principles of fairness and due process which laymen can understand and administer. As has been said in other contexts, what affects the rights of one of its members affects all the members. This Association will be strengthened, not harmed, by a judicial requirement that the Association's rules, such as it determines to best serve its purposes, be clear, fair and adequate, and, secondly, that they be enforced with openness and fairness and with procedural due process.

No wrongdoing attributable to personal malice is intended to be found against any of the individual Defendants involved. That is to be distinguished, however, from fault, negligence and a lack of understanding of their own powers and responsibilities. The Association officers must recognize in particular the gravity of any but the most considered and judicial use of their powers. Old, ad hoc, informal and pro forma committee procedures bordering on the arbitrary, without the opportunity for the challenged member to know exactly what the full charge is and to test and to meet it if he can in a full, fair, and

open hearing before the decision is reached are outmoded and dangerous. Those who conduct the hearings and make the decisions must be unbiased and maintain open minds until they have heard the whole story in open hearings with the challenged member, who has been given adequate notice and time to prepare. This Court differs with the view of Defendants as to what standards are now required for such an Association in such matters in the light of current and expanding concepts of due process. It is time for such associations to re-evaluate their practices so that the pursuit of their worthy goals will be furthered by reasonable, fair and just rules and procedures.

In this particular case, all parties agreed the narrow issue to be decided had to do only with whether and under what circumstances an Association rule about blood typing had allegedly been violated by Plaintiffs as determined by Association hearings resulting in Plaintiffs' indefinite suspension. But underlying all the actions and circumstances made known to this Court runs the' strong underlying and coloring current, sometimes openly, that Plaintiffs had two bulls, one with pure blood and one without, and the one without was the prize winner taken to shows and the other was the one used to pass the prior blood tests. This Court is not going to pass on whether any rule was in fact broken by the Plaintiffs, and certainly will not now attempt to resolve any question about the existence or identity of two bulls. It will confine itself only' to the adequateness and fairness of the rules and the due process aspects of the hearings. However, as a practical matter, this underlying current, even though unsubstantiated in this record, cannot be entirely overlooked. This Court sees the resolution of those substantive matters to be only for Association determination, provided "due process" is followed. That the Association may have in fact arrived at a correct determination and have fully adequate reasons for its actions is not controlling here. Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

In this difficult practical situation, the Court is earnestly endeavoring only to apply a little horse sense to this bull situation.

Against this brief general background, the case is now considered in more detail.

This opinion will constitute the Court's findings of fact and conclusions of law for the purposes of Federal Rules Civil Procedure 52(a).

## FINDINGS OF FACT

1. The Defendant, American Angus Association, is an Illinois not for profit corporation engaged in interstate commerce and maintaining offices in St. Joseph, Missouri.

2 This Association is the sole entity in the United States for the registration of pedigrees of purebred Black Aberdeen Angus cattle. By the fact of such registration, Black Aberdeen Angus cattle are most desirable and the value of the animals is significantly increased thereby.

3. The Association has a total monopoly on the registration of pedigrees of purebred Black Aberdeen Angus cattle in the United States. If one desires to engage in the business of breeding, raising, showing, and selling registered purebred Black Aberdeen Angus cattle, he must be a member of the American Angus Association.

4. Plaintiffs are an Illinois partnership, McCreery Angus Farms, formed in 1971, and engaged in the business of breeding, registering, raising, exhibiting, purchasing, and selling registered purebred Black Aberdeen Angus cattle. John McCreery is the managing partner.

5. During the years 1972 and 1973, McCreery Angus Farms made great strides and developed a highly favorable reputation in the Black Aberdeen Angus breeding business.

6. Of particular significance to the success of the show activities of Mc-Creery Angus Farms was its November, 1972, bull calf, Billerose Lad 932, Tattoo 3634. Billerose Lad was designated bull calf champion at every exhibition where he was shown during 1973.

7. As Plaintiffs began to achieve success, rumors concerning purity and authenticity of Plaintiffs' show herd reached the American Angus Association's offices. To dispel such rumors, Plaintiffs allowed for blood typing of their entire show herd in April of 1973 under supervision agreed to by Plaintiffs and the Association.

8. Blood samples were drawn from all 48 animals in Plaintiffs' show herd on or about April 30, 1973, under the supervision of Wayne Cooper, the Registrar of the Association, and Dale Baird, the Regional Representative of the Association. The samples were labeled by Cooper and mailed by him to the Department of Dairy Science Laboratory of Ohio State University at Columbus, Ohio. The Department of Dairy Science Laboratory of Ohio State University, under the supervision of Dr. H. C. Hines, is the Association's exclusive agency for laboratory analyses to determine purity of breed and accuracy of recorded parentage of blood samples from Black Aberdeen Angus cattle.

9. Following a telephone conversation between Wayne Cooper and Dr. H. C. Hines on May 30, 1973, Hines sent Cooper a letter dated June 1, 1973 (Pl. Ex. 1), which Cooper received on June 4, 1973. Plaintiffs were not sent a copy of that letter. That letter, with accompanying laboratory analysis reports, reported to Cooper the results of the blood typing of Plaintiffs' show herd. Following a second telephone conversation between Cooper and Hines on June 5, 1973, Hines sent the identical laboratory analysis reports to Plaintiffs with a different covering letter dated June 7, 1973 (Pl. Ex. 2). Hines' letter to Plaintiffs omitted certain conclusions favorable to Plaintiffs and changed the wording with

respect to certain questioned animals from a neutral to a totally negative tenor.

10. Out of 48 animals so blood typed, 43, including Billerose Lad, were found to be purebred Black Aberdeen Angus. The registration for the remaining five animals was immediately surrendered by the Plaintiffs, and none of these played any role in subsequent actions arising in this controversy.

11. Plaintiffs' Exhibit 31, the Association's *Breeder's Reference Guide,* contains the Bylaws and Rules of the Association as of January 1, 1973. No amendments relevant to this action were adopted between January 1, 1973, and October 23, 1973.

12. On July 27, 1973, Wayne Cooper received an anonymous letter dated July 25, 1973, which made certain charges concerning misrepresentations of the purity and authenticity of Plaintiffs' animals, specifically Billerose Lad. He came into possession of another anonymous letter dated July 30, 1973, which contained substantially identical information.

13. A meeting of the Executive Committee of the Board of Directors of the Association was convened on August 4, specifically to discuss McCreery Angus Farms and these rumors. At this meeting, these two letters were presented to the Executive Committee as a complaint against McCreery Angus Farms, purportedly pursuant to Article VII of the Bylaws of the Association. No notice of such complaints were given to Plaintiffs.

14. It was then decided to type all of the Plaintiffs' bulls, including Billerose Lad, being shown in Louisville at the American Angus Futurity from August 4 to August 7, at the conclusion of the judging on August 7 with no notice to Plaintiffs prior to that time. This action of the Executive Committee was in violation of Article VII of the Association's Bylaws, in that any investigation by the Executive Committee must, by the terms of Article VII of the Association's Bylaws, be initiated by a com-

plaint by a member of the Association or a party in interest.

15. On August 7, 1973, a request to blood type the animals in question was made of Tom Miller, an employee of McCreery Angus Farms, who refused such request by advising that he had no authority to permit such action.

16. On August 10, 1973, the Executive Committee of the Association met by telephone and resolved to attempt the blood typing of Billerose Lad at the forthcoming Illinois State Fair in Springfield. In anticipation of a similar refusal to submit to blood typing at Springfield, a letter was drafted and dated that same day directing John McCreery to appear before the Executive Committee on August 25, 1973, to show cause why he had failed to allow blood samples to be taken from Billerose Lad in Louisville, Kentucky, and at the Illinois State Fair in Springfield. This letter was placed in a sealed envelope and delivered to the Association's regional representative in Illinois, Dale Baird, who was instructed to deliver the envelope to John McCreery or his employees at Springfield.

17. Plaintiffs John McCreery and Max Reynolds were present at the Illinois State Fair for a total of eight hours during the morning and afternoon of August 12, 1973. They observed Baird on at least two occasions during that day and exchanged greetings with him at least once during that day, but Baird said nothing to either owner concerning his instructions to request a blood sample from Billerose Lad, or the fact that he was in possession of a sealed letter addressed to John Mc-Creery.

18. On the morning of August 13, 1973, Baird approached Tom Miller who was present at the Illinois State Fair with various animals from the McCreery show herd including Billerose Lad. Baird attempted to deliver the sealed envelope which unbeknownst to both Miller and Baird, contained the notice of hearing. Miller told Baird he had no authority to deal with him, whereupon Baird departed to find John McCreery.

19. The sealed letter dated August 10, 1973, was delivered on August 13 to John McCreery present at the Springfield Fair, requesting John McCreery to appear at a hearing before the Executive Committee to show cause why he failed to allow blood samples to be taken from Billerose Lad in both Louisville and Springfield.

20. The hearing before the Executive Committee was held on August 25, 1973. At the beginning of the hearing on August 25, 1973, Sam Fullerton, Vice President of the Association and Chairman of the Executive Committee, advised John McCreery that the purpose of the hearing was:

" . . . to investigate charges which have been initiated by the Executive Committee against Mr. John McCreery, McCreery Angus Farms at Mason City, Illinois, involving Mr. McCreery's refusal to submit to the request of the representatives of the American Angus Association to have a certain registered Angus bull owned and exhibited by him blood typed on two separate occasions." (Pl. Ex. 37, at 2.)

21. John McCreery had no indication that the hearing had any purpose other than his alleged prior refusals to permit the blood typing of his animals.

22. Answering the only charge he understood to be lodged, McCreery explained that no blood tests had been taken because no one had made a request of him. At the conclusion of the hearing, a promise was made to McCreery that a written request that Billerose Lad be submitted to blood typing would be made. No written request was ever made to John McCreery or any of the owners of McCreery Angus Farms, and McCreery was never informed that no written request would be forthcoming.

23. The Executive Committee decided on or about August 25, 1973, that McCreery Angus Farms had been guilty of violating the Rules of the Association.

In making that determination, the Executive Committee considered and acted in part on the basis of the two anonymous letters previously presented to the Executive Committee on August 4, 1973. In so doing, the Executive Committee considered and acted upon charges of which Plaintiffs had no notice, and with which Plaintiffs had not been confronted.

24. On September 30, the Board of Directors met in Kansas City to discuss the McCreery Farms matter. No notice of such meeting was given to the Plaintiffs. At that meeting, the Board unanimously voted that a violation had occurred, basing such opinion on the presentation of anonymous letters and charges alleging misrepresentations, of which plaintiff had never been given formal notice.

25. Based on that determination, the Board first resolved immediately and unanimously to bar Billerose Lad without notice from further exhibition, although the Association's Rules did not, at the time, provide for any such summary sanction. John McCreery was later informed of this action by a letter dated October 12, 1973 (Pl. Ex. 21). There was, as of September 30, 1973, no provision in the Association's Rules authorizing such action. Such a provision was first adopted by the Board on October 23, 1973 (Pl. Ex. 28).

26. At the September 30 meeting, the staff presented the Board with a draft letter to John McCreery stating that it had "determined" that McCreery Angus Farms had violated the Association's Rules in failing to submit Billerose Lad to a blood test in Louisville and Springfield, and requiring John McCreery to attend a hearing on October 23, 1973, to show cause why McCreery Angus Farms should not be disciplined. Counsel for the Association suggested that while it was true that the Board had made up its mind, it would be safer if the language of the letter were changed from the Board had "determined" that there had been a violation, to the Board "is of the opinion" that

there was a violation. Accordingly, this change was made in the letter sent to McCreery on September 30, 1973. (Pl. Ex. 20.)

27. The September 30, 1973, meeting of the Board of Directors of the Association coincided with the World Angus Forum being held in Kansas City. McCreery Angus Farms' bull calf Billerose Lad was present at the show on that date in the care of Dennis Wieber, an employee of McCreery Angus Farms. During the morning of September 30, Wieber presented Billerose Lad for examination by show officials. When the Association's representatives attempted to blood type Billerose Lad, Wieber told them he had no authority to permit a blood type and would have to consult his superiors. McCreery derived the impression that Cooper and Baird had surreptitiously attempted to lead Billerose Lad off to blood type him. He did not learn that the Association claimed that all bulls at the show were being blood typed. Uncertain as to the circumstances, McCreery withdrew the bull from the Kansas City show. Accordingly, the Board modified its notice of hearing to McCreery and added Kansas City to the two prior alleged refusals at Louisville and Springfield.

28. The notice sent to John McCreery stated that he should be prepared to answer charges concerning: (1) Refusals to permit blood samples to be taken, and (2) "misrepresentation of animals registered and exhibited." (Pl. Ex. 20.) This was the first notice to McCreery of the additional charges against him. After receiving notice of the hearing scheduled for October 23, 1973, John McCreery wrote the Association on October 12, 1973, requesting and seeking a continuance of one month to prepare an adequate defense and a specification of the exact charges against him. (Pl. Ex. 22) This request was not communicated to the Board of Directors prior to October 23. Instead, counsel for the Association wrote McCreery, stating that he was not authorized to provide such notice or continuance and

admonished McCreery to appear at the October 23 hearing. (Pl. Ex. 23)

29. In view of the Board of Directors, the purpose of the October 23, 1973, hearing was simply to permit John McCreery to have an opportunity to mitigate disciplinary action to be taken on that date and to satisfy the requirements of "due process".

30. On October 23, 1973, the Board of Directors convened in St. Joseph, Missouri, and conferred in closed session for a brief period prior to inviting John McCreery into the hearing room. At this time, Mr. Fullerton reread to the Board the two anonymous letters, a staff memorandum concerning the alleged misrepresentations, the minutes of the various Executive Committee meetings and the minutes of the September 30 Board meeting. After this reading, the Board members were advised by counsel for the Association that John McCreery might ask questions designed to force the Board of Directors to disclose the nature of the charges against him and the identity of his accusers. The Board was advised by counsel to say as little as possible and restrict the hearing to the question of blood typing of Billerose Lad. The Board was advised not to disclose the nature of the other charges made against McCreery Angus Farms nor the identity of the complainants. At that point, John McCreery was invited into the room.

31. While presiding at the October 23 hearing, Sam C. Fullerton advised McCreery that the Board was proceeding under a certain Section of the Rules and an Article of the Bylaws of the Association. The Board, however, at a later date, stated it had proceeded under a different section of the Rules.

32. At the October 23, 1973, hearing McCreery reiterated that Billerose Lad had not been blood typed because the Association had never made a request of him or any of the owners. Fullerton stated that the written request to McCreery which had been promised was not sent because the Executive Committee thought it would be less inconvenient to type the bull at the World Angus Forum on September 30, 1973.

33. Immediately following the McCreery hearing on October 23, 1973, the board took up another matter known as the "Haas heifers". This matter involved a personal sale by Tom Miller of his own animals to a Mr. Haas. It is undisputed that the animals were not owned by McCreery Angus Farms and that Miller was not acting for McCreery Angus Farms in any way in selling them. Nevertheless, the Association considered the McCreery matter and the Haas matter "interrelated".

34. When the McCreery Angus Farms matter was taken up on October 24, 1973, there was no discussion of whether John McCreery had given adequate reasons for the alleged refusals to permit the taking of blood samples. The determination that Plaintiffs had violated the rules was made on September 30. Instead, the Board turned to Fullerton, as the man most familiar with the case, to recommend an appropriate punishment. Fullerton recommended expulsion or suspension for at least two years. It was resolved unanimously, however, to suspend McCreery Angus Farms indefinitely.

35. In arriving at their ultimate decision, the Board considered not only the alleged refusal by McCreery to allow certain blood typing, but also anonymous allegations questioning the ethical standards and practices of the Plaintiffs. Furthermore, it was hoped that a suspension of McCreery Angus Farms would put pressure on John McCreery to provide the Association the evidence it wanted against Tom Miller concerning the anonymous charges in the McCreery case and the negative allegations made in the case of the "Haas heifers". In the words of one Board member, his suspension should be indefinite "so we can smoke Tom Miller out of the bushes". In so acting, the Board of Directors decided that Plaintiffs were guilty of charges of which Plaintiffs had never

had notice, and with which they were never confronted.

36. There are nowhere in the Rules and Bylaws of the Association any express provisions governing the conduct of any hearing at which a member violation is in issue, or the rights of any party involved in such a hearing. Furthermore, in the view of the Board of Directors, it has unfettered discretion as to the nature and duration of the disciplinary sanctions it may impose.

37. Plaintiffs were advised of their indefinite suspension by a letter dated October 29, 1973. (Pl. Ex. 24) That letter gave no reasons for Plaintiffs' indefinite suspension.

38. On November 18, 1973, the Board of Directors of the Association met in Chicago. Plaintiffs caused to be delivered to that meeting a letter offering Billerose Lad for blood typing. This offer was rejected by the Board.

39. On November 19, 1973, at the Annual Convention of the Association, the delegates affirmed the Board decision of October 24, 1973. The convention of delegates was not, however, apprised of Plaintiffs' offer to the Board of Directors the previous day relative to the blood typing of Billerose Lad.

40. As a result of their indefinite suspension from membership in the American Angus Association, McCreery Angus Farms is prohibited from registering its newly born purebred Black Aberdeen Angus cattle, transferring title to, or exhibiting its registered purebred Black Aberdeen Angus cattle.

## CONCLUSIONS OF LAW

1. The conduct to be enjoined is in furtherance of the alleged antitrust violations.

2. The Plaintiffs have established that they have a reasonable likelihood of success on the merits.

3. A group boycott is illegal per se.

4. The Plaintiffs will suffer irreparable injury unless the requested relief is granted.

5. The Plaintiffs' remedy at law is inadequate.

6. Any possible injury which may inure to the Defendants by reason of granting such relief is not irreparable, and when compared to the injury the Plaintiffs would suffer, is negligible.

7. The issuance of a preliminary injunction will maintain the status quo.

8. Any Finding of Fact which should be deemed a Conclusion of Law is hereby adopted as such.

■ In order to prevail on its Motion for a Preliminary Injunction, the Plaintiffs must demonstrate that: (1) They have at least a reasonable likelihood of success on the merits; (2) Their remedy at law is inadequate and they will be irreparably injured unless the injunction issues; and (3) The balance of hardships tips in its favor. Milsen Co. v. Southland Corp., 454 F.2d 363, 367 (7th Cir. 1971); Pure Food Products, Inc. v. American Bakeries Company, 356 F. Supp. 701, 702 (N.D.Ill.1973).

The Plaintiffs argue that their indefinite suspension by the Defendant Association constitutes a group boycott in clear violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1970).

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1970) provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . ."

Section 2 of the Act, 15 U.S.C. § 2 (1970) states that it is illegal to:

". . . monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States. . . ."

■ Two threshold elements must be present before any group boycott or concerted refusal to deal can be illegal under these Sections: (1) There must be

some effect on "trade or commerce among the several States" and (2) there must be sufficient agreement to constitute a "contract, combination . . . or conspiracy." 15 U.S.C. § 1, Blalock v. Ladies Professional Golf Association, 359 F.Supp. 1260, 1263 (N.D.Ga.1973), Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1062 (C.D.Cal. 1971). It is apparent that both of these elements are present. The interstate nature of the Defendant Association is obvious. The Board of Directors is made up of breeders from many states and the Association represents some 60,000 in all fifty states. As to the second element, the Defendants vigorously argue that the Plaintiffs have failed to show the requisite agreement to constitute a "contract, combination . . . or conspiracy." In their brief the Defendants (p. 16) state, "In our case there is not one word of testimony of any agreement among the parties to a conspiracy or to a combination. There is not one iota of evidence that any of the conspirators in any way entered into any agreement."

The Defendants' contention is not well taken. The requisite agreement needed to bring the activity in question within the ambit of the Sherman Act is provided by the very bylaw under which the Defendants are alleged to have acted. In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court found the bylaws of the Exchange pursuant to which the Plaintiffs' direct wire privileges were suspended provided the sufficient "agreement". As stated in one comment, "The mere involvement of an association generally would provide the requisite element of combination or conspiracy."

As both parties concede, the Supreme Court in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) established the "rule of reason" standard by which alleged antitrust violations are to be measured.

The Sherman Act, as so construed by the Supreme Court, prohibits only contracts and combinations which amount to unreasonable or undue restraint of trade. The Court has, however, carved out several exceptions to the generally applicable "rule of reason" and declared certain practices to be *per se* illegal. This classification of certain practices as *per se* illegal obviates the need for complex factual inquiries to determine the economic necessity of the type of activity in question. As the Supreme Court stated in Northern. Pacific v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957):

> "(T)here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., 85 F. 271, 46 L.R.A. 122 aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L. Ed. 136; group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20."

In Fashion Originators' Guild v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the Supreme Court upheld an FTC cease and desist order entered against a group of "original" designers who refused to sell their creations to retailers who purchased and sold copies of the original designs. Although the purpose of the boycott was to prevent "style piracy", the Court upheld the Commission's refusal to hear evidence on the reasonableness of the methods pursued by the combination. Such evidence "is no more material than would be the reasonableness of the prices fixed by unlawful combination". 312 U.S. at 468, 61 S.Ct. at 708. The Court noted that even if the systematic copying of designs was tortious, that circumstance would not justify a group boycott.

The Plaintiffs also rely on Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), which held that the Exchange had engaged in an illegal group boycott which constituted a *per se* violation of the Sherman Act. The Court further rejected the contention of the Exchange that the Securities Exchange Act provided a pervasive exemption from the antitrust laws. The Court found that the procedurally unfair action of the Exchange in terminating the direct wire connection of a non-member was not justified under the Securities Exchange Act and, thus, constituted an antitrust violation.

The Defendants argue that its actions fall within the narrow exception to the *per se* rule set forth in *Silver* and discussed in Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1064–1065 (C.D.Cal.1971) in which the Court stated:

"Thus, *Silver* seems to envision the application of the *per se* rule to group boycott cases, with one narrow exception. A factual situation falling into this exception would be governed by the 'rule of reason'. To qualify for this exception it would have to be shown that:

"(1) There is a legislative mandate for self-regulation 'or otherwise'. In discussing the history of the New York Stock Exchange in *Silver*, the Court suggests that self-regulation is inherently required by the market's structure. From this basis, it has been argued that where collective action is required by the industry structure, it falls within the 'or otherwise' provision of *Silver*. Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1468 (1966).

"(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary.

"(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review."

The Defendants argue that their actions fall within the narrow *Silver* exception to the *per se* rule. They state, at p. 18 of their Brief, "What the Silver case did was to point out that the procedures followed were unfair and not justified and it was on that basis that it acted. In our case procedures were fair and proper and were followed."

That contention cannot stand in the face of substantial evidence that: (1) The Plaintiffs were not given notice of the charge of misrepresentation made against them prior to the consideration of those charges by the Association; (2) The Plaintiffs were not given adequate opportunity to respond to the charges of misrepresentation against them; (3) The Plaintiffs were never given any opportunity to confront their actual accuser in the matter of misrepresentation.

██ The Defendants correctly cite Jackson v. American Yorkshire Club, 340 F.Supp. 628 (N.D.Iowa 1971), for the proposition the Courts will not interfere with the internal disciplinary pro-

ceedings of a private association when "there is nothing in it in violation of the law of the land." (Defendants' Brief, P. 14). It is interesting to note that in that case, the Court held the Plaintiff's suspension from a purebred swine breeding association to have been unlawful and void for want of procedural fairness. The Jackson case, unlike the case at bar, did not involve any allegations of violations of the antitrust laws. The present case, therefore, provides a demonstrably stronger justification for judicial intervention into the internal affairs of a private association.

The Defendants very accurately state that "courts are loath to interfere" in the internal affairs of private associations. *See generally*, Chafee, The Internal Affairs of Association Not for Profit, 43 Harv.L.Rev. 993 (1930).

This Court will not be the bull in the china shop of private associations' internal affairs.

The Court, however, must not ignore the power that monopolistic private associations exercise over their members. As has been observed by one commentator, "Since the leaders of groups which have an economic stranglehold are relatively free from control by membership withdrawal, it would seem more important that other controls, such as judicial intervention, be available. . . . The group, then, may not be allowed to appeal solely to its own goals as justification, but may have to justify its practices in the light of broader social interests." Developments in the Law—Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 983, 994 (1963).

The Court must, at this juncture, note the inadequacy of the rules of the Association for considering charges that can result in sanctions against member-breeders. There are no rules setting forth even the most basic and elemental requirements of a fair hearing.

Certain broad principles of fair hearing seem applicable to this situation. "Ordinarily, the member seems entitled to notice of the charges and an opportunity to present and time to prepare his defense. Unless he knows the charges against him, he will be unable to bring forth a reasoned defense." *Id*. at 1028.

The Plaintiffs have also met their burden, proving that they would: (1) Suffer irreparable injury if the preliminary injunction were not granted, and (2) that the Defendants would suffer little or no harm as a result of this preliminary injunction as hereinafter ordered.

The complete control of the registered purebred Black Aberdeen Angus breeding business by the Association means in effect that the Plaintiffs are completely out of the business of raising and selling purebred registered Black Aberdeen Angus cattle while they are under indefinite suspension. The only possible injury to the Defendant Association could occur from crossbred blood lines being introduced into the breed. As to all of those cattle of the Defendants which are not offspring of the allegedly misrepresented bull no possible harm can result from their registration or transfer. As to those animals which are, the remedy provided by this Order of a notation on the registration papers indicating the question of misrepresentation has yet to be resolved will: (1) Protect all third party purchasers or transferees; (2) protect the Association from any possible liability; and (3) permit resolution of the question of misrepresentation. It will, however, no doubt adversely affect the sale price of any such animal actually sold. The evidence provided by the Association as to any possible damage to be suffered by the Association was essentially vague and conclusory; therefore, the balance of equities in this case clearly tips in favor of the Plaintiffs pursuant to the Order as hereinafter obtained.

For the above stated reasons, it is hereby adjudged, ordered and decreed that the indefinite suspension of the Plaintiffs is void and the preliminary injunction is issued in furtherance of this Order.

## PRELIMINARY INJUNCTION

This matter having been heard on Plaintiffs' Motion for a Preliminary Injunction, and an evidentiary hearing having been held January 9 through January 12, 1974, and both the Plaintiffs and Defendants having appeared in said hearing, presented extensive testimony of witnesses, introduced documents, tapes and portions of transcripts of depositions taken in this action, and the Court being fully advised in the premises, and it appearing that the Defendant American Angus Association has indefinitely suspended Plaintiff McCreery Angus Farms from membership in the Association thereby depriving it of the ability to register, market or exhibit registered purebred Black Aberdeen Angus cattle, and the Plaintiffs having demonstrated a reasonable likelihood of establishing at trial that the Defendant has effected a group boycott of the Plaintiff in the registered purebred Black Aberdeen Angus cattle industry in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and that Plaintiffs are suffering and will continue to suffer immediate and irreparable injury from the indefinite suspension during the course of this litigation, and that Defendant Association will suffer no injury if a preliminary injunction is entered as hereinafter limited, and that the public interest will be served by the immediate reinstatement of Plaintiff McCreery Angus Farms to the extent herein provided, it is therefore

Ordered, adjudged and decreed that:

1. Defendant American Angus Association, its members, officers, agents, employees, attorneys, and all persons in active concert or participation with them, pending the final hearing and decision in this action, are enjoined from applying the charter, bylaws or rules of the Association in any manner so as to prevent, impair or interfere with, or from taking any other action, directly or indirectly, to prevent, impair or interfere with McCreery Angus Farms, its partners, employees and agents in breeding and registering purebred Black Aberdeen Angus cattle or marketing or exhibiting registered purebred Black Aberdeen Angus cattle, subject, however, to the special conditions and limitations hereinafter imposed.

2. Defendant American Angus Association, its officers, agents, employees and attorneys shall forthwith, pending the final hearing and decision in this action, reinstate Plaintiff McCreery Angus Farms as an active member of the Association with all rights and privileges appurtenant thereto and shall, if requested by Plaintiffs, forthwith publish notice in the manner best calculated to reach all members of the Association, including but not limited to the next issue of the *Angus Bulletin,* of the reinstatement of McCreery Angus Farms, but all subject to and including the special limitations and conditions hereinafter imposed.

3. Defendant American Angus Association, its officers, agents, employees, attorneys and all persons in active concert or participation with them, shall not, pending the final hearing and decision in this action, induce or attempt to induce directly or indirectly any past, present or potential customer of McCreery Angus Farms to refuse to purchase registered purebred Black Aberdeen Angus cattle from Plaintiff McCreery Angus Farms or to disparage, demean or impugn to any such person the purity or quality of the animals owned, exhibited and offered for sale by McCreery Angus Farms or the integrity, honesty or reputation of the owners, agents or employees of McCreery Angus Farms, but all subject to the special limitations and conditions hereinafter imposed.

4. Nothing in this order shall be deemed to prohibit the Association from requiring McCreery Angus Farms, pursuant to a written or oral request with a reasonable explanation therefor submitted to one of its partners, or to the agent present and in charge of the

cattle and representing McCreery Angus Farms, to permit the Association a reasonable opportunity to have a competent and licensed veterinarian blood type any of the registered purebred Black Aberdeen Angus cattle hereafter entered or exhibited by McCreery Angus Farms at an exhibition sponsored in whole or in part by the Association.

5. The general orders above set forth are subject to the following special conditions and limitation. This Court does not intend to fully reinstate Plaintiffs' rights as a member of the Association insofar as they relate to the bull Billerose Lad 932, Tattoo 3634, and its offspring which are and have been under investigation by the Association. Irreparable harm could be done to the breed and to innocent purchasers by complete reinstatement without limitation if in fact a proper and complete investigation by the Association should hereafter reveal adequate basis for denying purebred status to the bull in question and its offspring. However, the whole herd of the Plaintiff should not be suspect and disqualified indefinitely because of pending and unresolved allegations about one bull and its offspring unrelated to the others. Plaintiff has as yet had no adequate opportunity to respond to the charges and allegations concerning this bull and its offspring, but the potential damage and risk to the Association and to others is greater than to the Plaintiff who must suffer this disability until it is resolved. This Court will not assume that risk and ignore the allegations about this bull and its offspring, even considering some of the allegations were based on rumors and anonymous calls and letters. Neither does this Court intend to infer there may be any truth whatsoever to the allegations. It is a serious and unresolved question which cannot here be ignored.

(a) There is intended to be no limitation on Plaintiffs in the breeding and registering of purebred Black Aberdeen Angus cattle or marketing and exhibiting the same, which are not themselves the subject of any pending investigation of the Association related to their heredity, and in particular which have not been sired by the bull tattooed 3634 Billerose Lad.

(b) Calves sired by the bull Billerose Lad tattooed 3634 may be registered on a temporary basis within the time as extended by stipulation of the parties without financial penalty to Plaintiffs, but the registration papers shall bear in a prominent place or attached thereto a suitable notation to the effect that the heredity of the particular calf is in doubt and under investigation and therefore the Association does not vouch for it being purebred, and that the note is appended by Order of Court. The intent is that such cattle may be registered and sold, but at the buyers' complete risk until the matter is resolved.

(c) If and when the question of being purebred is resolved by the Association and if favorable to the Plaintiff, then new papers shall be issued by the Association without any such qualifying notation. If it is resolved in favor of the Defendant, the registration may be cancelled forthwith by the Association.

(d) This order does not require the Association to permit the bull Billerose Lad 932, Tattoo 3634, to be shown, unless that particular bull at the show is submitted for blood test in accordance with Association rules. The same applies to any of the offspring of such bull. However, passing of the prescribed blood test under these conditions will not be deemed by this Court to have resolved the question of the identity of the bull insofar as the investigation being conducted by the Association is concerned in view of the allegation that there may be two bulls bearing the same tattoo.

(e) The registration papers of Billerose Lad, Tattoo 3634, shall be submitted by Plaintiffs to the Association so as to be temporarily noted thereon that an investigation is pending involving the identity and purebred status of this bull.

(f) The question of the purebred status and identity of this bull, though not

directly an issue in this case is so inextricably intertwined and underlying that it cannot as a practical matter be ignored. It appears to have given rise to the believed necessity for the blood typing requests in the first instance. It admittedly colored the thinking of at least some of those in the Association Committee and Board who passed on this suspension. Both parties are therefore directed to submit to this Court within thirty days from the date of this Order a fair and reasonable plan or program of how the Association and Plaintiffs may proceed to resolve the pure-bred and identity question fairly and fully so as to remove the doubt or to establish the bull's disqualification. If the matter in accordance with any plan adopted is thereafter resolved in favor of Plaintiffs, this preliminary injunction may be enlarged in scope. If it is not resolved in favor of Plaintiffs, the Association will be free to take such action under its Constitution and Bylaws as the circumstances of the investigation may suggest as proper, and in such event this Court will re-examine and review the propriety of this preliminary injunction hereby granting to Plaintiffs this partial and limited relief.

6. This Court will consider any proposed modification of this Order during its existence submitted by any party, the purpose of which is to make the injunction more practicable and workable within the spirit and intent of this Order.

7. Plaintiffs shall post a bond in the amount of $500 for the payment of such costs and damages as may be incurred or suffered by Defendant American Angus Association, if it is hereafter determined in this action that the Defendant has been wrongfully injured or restrained hereby.

8. This Court retains jurisdiction to enforce the provisions of this Preliminary Injunction, for the purpose of issuing orders to clarify, modify or amend any of the provisions hereof and for all other purposes.

## ORDER AMENDING PRELIMINARY INJUNCTION

The Order of this Court granting a Preliminary Injunction in the above captioned case is amended, the original Order to be read and applied consistent with the intentions expressed herein:

(a) The purpose and intention of the Order is to place the Plaintiffs in the same position as all other members of the Association except as to the provision relating to the bull calf Billerose Lad 932 and offspring as provided in the original Preliminary Injunction. The Plaintiffs are to have no greater or lesser rights, privileges, immunities or responsibilities than any other member of the Association in good standing except as provided therein.