No. 97-415

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 260N

BLUE DANE SIMMENTAL, INC., et al.,

Plaintiffs, Counterdefendants,

Appellants, and Cross-Respondents,

v.

AMERICAN SIMMENTAL ASSOCIATION,

Defendant, Counterplaintiff,

Respondent, and Cross-Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

David H. Hahn, Hahn Law Office; Lincoln, Nebraska

Karl Knuchel, Attorney at Law; Livingston, Montana

For Respondent:

James H. Goetz and Robert K. Baldwin; Goetz, Madden & Dunn, P.C.;

Bozeman, Montana

V. Gene Summerlin and Krista Kester; Ogborn & Summerlin, P.C.;

Lincoln, Nebraska

Submitted on Briefs: July 16, 1998

Decided: November 5, 1998

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1. Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.**

**¶2. Appellants ("the Members") brought a dissolution action against the respondent corporation, the American Simmental Association ("ASA"), in the Eighteenth Judicial District,**

Gallatin County, pursuant to the Montana Nonprofit Corporation Act. They alleged that the ASA fraudulently registered certain cattle as full-blood Simmentals, and requested that the ASA corporation be dissolved or be subject to any reasonable alternative under § 35-2-728, MCA. The District Court found in favor of the ASA, and the Members appeal. Upon our review, we uphold the District Court's decision, but remand the ASA's argument for attorney fees for the District Court's consideration.

¶3. This Court finds the following issues dispositive on appeal:

¶4. 1. Did the District Court properly find that the ASA was not involved in illegal, oppressive, or fraudulent conduct under § 35-2-728(1)(b)(ii), MCA?

¶5. 2. Did the District Court provide the Members a fair trial?

¶6. 3. Should either party be awarded costs and attorney fees?

## FACTUAL BACKGROUND

¶7. The American Simmental Association is a nonprofit corporation with its principal place of business in Bozeman, Montana. The primary purpose of the ASA, according to its bylaws, is to "maintain the standards for eligibility of simmental . . . cattle prior to entering them into the . . . herdbook registry." Pursuant to its purpose, the ASA maintains a formal registry and registration procedures.

¶8. The ASA registry provides for a special classification of "full-blood" Simmental cattle, bred wholly from European Simmental stock. In 1988, the ASA's registration procedure required that an applicant show proof of a full-blood

animal's ancestry back to Simmental herdbooks in France, Germany, Austria, or Switzerland. In response to the membership's concerns that this did not guarantee an animal's genetic integrity because cattle registered in Simmental herdbooks may have been bred from other cattle to upgrade certain marketing traits, the ASA Board stated a policy that only animals whose genetic background completely traced back to Simmental cattle could receive the special full-blood classification. Animals with other cattle breeds in their ancestry could not be classified as full bloods. However, the ASA did not modify its registration procedure until 1994 to guarantee this. In 1992, the ASA implemented a policy to require that an applicant provide a copy of a registration certificate from a recognized Simmental registry that indicated that an animal's ancestry originated from one of the four specified countries. Ultimately, in 1994, the ASA required that an applicant provide a certificate of registration going back five generations into the animal's ancestry, plus satisfactory evidence that the registered animal had no known ancestry of another cattle breed. The 1994 rule contained a grandfather clause which stated that "[a]ll existing Herdbook entries in the ASA Registry that currently are designated as Fullblood shall retain that status."

¶9. The ASA also required that registered animals used in embryo transfer programs be bloodtyped. This is a scientific process used to verify an animal's parental lineage which, thereby, allows breeders and cattle buyers to investigate the performance data of the animal's ancestry. In some cases, a registered animal and its parents were bloodtyped. However, when bloodtyping information on the animal's parents could not be obtained, the ASA staff routinely registered animals with bloodtyping information only on the animal itself. The staff used computer codes to identify what bloodtyping information was available for each animal. They used code Z-8 to denote when neither parent was

bloodtyped, just the registered animal.

¶10. Mr. Risinger, a Simmental cattle breeder, was an ASA member who, in 1991, served on the ASA's board and executive committee and in 1994, served as the ASA's president. In 1991 and 1992, Mr. Risinger registered a total of nineteen cattle ("the Risinger animals") as full-blood Simmentals. Even though he did not own the cattle or even have possession of them, he held exclusive rights to their semen and embryos. The cattle were otherwise owned by Mr. Raby, who imported the cattle from Germany to England and kept the cattle in England. Hence, when Mr. Risinger registered the cattle with the ASA, he produced copies of registration certificates from German herdbooks.

¶11. Two of the bulls that Mr. Risinger registered had the unique trait of being homozygous polled--that is, they had a favored market quality of being genetically hornless. The parties stipulate that a grandsire of these bulls had three percent Angus genetics, leaving the registered bulls with approximately 0.75 percent Angus genetics. The bulls were registered as full-blood Simmentals with the ASA, nonetheless.

¶12. Twelve of the Risinger animals did not have parental bloodtyping before they were registered. Instead, the ASA staff obtained bloodtyping information only on the animals themselves and coded them Z-8.

¶13. The Members expressed concerns over the registration of these animals to the ASA. In response, the ASA scheduled a hearing to investigate the registration; however, the Members boycotted the hearing, so it was not held. The Members, thereafter, commenced litigation in the Eighteenth Judicial District, Gallatin County, in April 1994 and filed a formal compliant with the ASA Board. The ASA Board appointed two former trustees to investigate the complaint

and make recommendations to an executive committee. On April 24, 1995, the executive committee held a hearing involving all concerned parties, and decided that no action was warranted in the best interests of the ASA. The District Court issued its findings on January 3, 1997, concluding that the ASA made its decision in good faith and that it did not act illegally, oppressively, or fraudulently.

## STANDARD OF REVIEW

¶14. The standard of review of a district court s findings of fact is whether they are clearly erroneous. See Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906 (citing Columbia Grain Int'l v. Cereck (1993), 258 Mont. 414, 417, 852 P.2d 676, 678). To determine whether the findings are clearly erroneous, we apply a three-part test: (1) the Court will determine whether the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, the Court will determine if the trial court has misapprehended the evidence; and (3) if the findings are supported by substantial evidence and that evidence has not been misapprehended, this Court may still conclude that "[a] finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287 (citing United States v. United States Gypsum Co. (1948), 333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746); see also Daines, 269 Mont. at 325, 888 P.2d at 906.

¶15. The standard of review of a district court s conclusions of law is whether the court s interpretation of the law is correct. See Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686 (citing Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-04). See also Kreger v.

Francis (1995), 271 Mont. 444, 447, 898 P.2d 672, 674. In this case, however, the Members do not raise the District Court's interpretation of the law as an issue.

## ISSUE 1

¶16. Did the District Court properly find that the ASA was not involved in illegal, oppressive, or fraudulent conduct under § 35-2-728(1)(b)(ii), MCA?

¶17. Pursuant to the Montana Nonprofit Corporation Act, § 35-2-728, MCA, the Members ask us to dissolve the ASA corporation or, in the alternative, strictly enforce the ASA's written registration procedure and cause the Risinger animals to be removed from the ASA registry. However, we recognize the inherent limitations a court has in corporate matters. Under § 35-2-728(1)(b)(ii), MCA, a court can dissolve a corporation only if "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Section 35-2-728(2)(a), MCA, allows other judicial action, such as removing the Risinger animals from the ASA registry, as a reasonable alternative to a corporate dissolution.

¶18. The District Court correctly stated that it will not intervene in the internal affairs of the corporation and second-guess the judgment of corporate officials. Other state courts that have reviewed breed associations' registry decisions also have refrained from intervening in such decisions. See, e.g., Jackson v. American Yorkshire Club (N. D. Iowa 1971), 340 F. Supp. 628 (holding such decisions rest with the board of directors so long as the decision is vested with the necessary legalities); McCreery Angus Farms v. American Angus Ass'n (S.D. Ill. 1974), 379 F. Supp. 1008, aff'd without op., (7th Cir. 1974), 506 F.2d 1404 (limiting its review to the association's procedure). We agree that the role of the courts is not to hold a breed association

strictly to its registration procedure, but only to assure that the association applies its procedure without illegal, oppressive, or fraudulent motives. If, for example, the association follows a common practice that is not consistent with its written procedure, we will conclude that its motives are, nonetheless, in accordance with the law.

¶19. To determine the ASA's common practice and written procedure at the time it registered the Risinger animals, the District Court correctly looked to the 1988 procedure in regard to the animals registered in 1991, and the 1992 procedure in regard to the remaining animals registered in 1992. Also, the District Court correctly rejected the Members' contention that the grandfather clause in the more stringent 1994 procedure represented the ASA Board's intention that all animals previously registered as full bloods should have already met the genetic integrity requirement. To the contrary, the record establishes that the ASA used the 1994 grandfather clause to avoid the costs of investigating the genetic background of all previously registered animals and the complications of expunging animals from the full-blood registry. The ASA was well aware that its 1988 and 1992 procedures did not guarantee genetic integrity.

¶20. For this reason, we do not agree with the Members' argument that the two Risinger bulls should not have been registered as full bloods because they had Angus genetics. In our review, the Angus genetics are not controlling.

¶21. By the terms of the 1988 and 1992 procedures, the ASA should have required Mr. Risinger to show proof of his animals' ancestry back to Simmental herdbooks in France,

Germany, Austria, or Switzerland and, for the animals registered in 1992, copies of registration certificates from a recognized Simmental registry indicating that the animals' ancestors originated from one of the four specified countries. The Members

contend that the German herdbook used for the Risinger animals was not a qualified herdbook and that the registration certificates were not adequate. The Members further argue that the District Court abused its discretion when, at trial, it refused to receive expert testimony from Richard Tetherow, a former ASA trustee and past president, who could identify a qualified herdbook. The District Court allowed the Members to make an offer of proof, then determined that the information sought from Mr. Tetherow was highly specialized and required intimate knowledge with the various German herdbooks, which he did not have. We have held that the determination of the qualification of an expert witness is a matter of discretion for the trial court, and that, absent a showing of abuse of discretion, we will not disturb the district court's decision. See In re Marriage of Lee (1997), 282 Mont. 410, 422, 938 P.2d 650, 658. By the facts of the record, we conclude that the German herdbook and the registration certificates that the ASA used to register the Risinger animals were not inconsistent with the ASA's common practice in registering full-blood animals. Therefore, the ASA did not act illegally, oppressively, or fraudulently.

¶22. The Members draw our attention to an additional fact that Mr. Risinger signed the registration papers for the animals even though he was not their owner. There is ample evidence, however, that the ASA had a long-standing, common practice of allowing owners of semen or embryo rights of animals to register the animals.

¶23. Next, the Members focus on the issue of bloodtyping. The relevant ASA bloodtyping provision states:

All sires used in an embryo transfer program or whose semen is frozen for the first time for A.I. use and any donor dams placed in embryo transfer for the first time, along with their parents, must be bloodtyped at the owner's expense to confirm both sire and dam parentage. The results must be filed with the Association prior to the distribution of semen or the performing of any embryo transplant procedures. (ASA reserves the right to grant exceptions if the dam or sire is dead or is located in a foreign country).

The Members allege that the ASA fraudulently failed to enforce bloodtyping requirements on the Risinger animals and their parents when the animals were registered. The record does not support this allegation, however. The facts of the record strongly suggest that the ASA routinely registered animals with bloodtyping information only on the animals

themselves.

¶24. The Members also contend that the ASA staff did not have authority to waive the bloodtyping requirements when it registered the Risinger animals. The Members interpret the bloodtyping provision to mean that only the ASA's executive committee had such authority. We conclude that the record adequately shows that waivers were routinely granted by the staff, despite conflicting testimony. Where there is conflicting evidence, it is within the province of the trier of fact to weigh the evidence and determine the credibility of witnesses; we will not substitute our judgment for that of the trier of fact on such matters. See Garrison v. Averill (1997), 282 Mont. 508, 518-19, 938 P.2d 702, 708.

¶25. Finally, the Members advance a theory that Mr. Risinger was treated with preference because he was a corporate insider. They allege that only insiders, like Mr. Risinger, knew about the opportunity to receive bloodtyping waivers. They also allege that the ASA protected the Risinger animals' registration by offering misleading information about the animals to ASA members in exchange for Mr. Risinger's support of the 1994 grandfather clause and a salary increase for staff. This theory is unsubstantiated by the facts of the record.

¶26. In conclusion, we hold that the ASA acted in accordance with its common practices when it registered the Risinger animals. There is substantial evidence to support the District Court's findings that the ASA was not involved in illegal, oppressive, or fraudulent conduct. Furthermore, the District Court did not misapprehend the evidence or make a mistake.

## ISSUE 2

¶27. Did the District Court provide the Members a fair

trial?

¶28. The Members argue that the District Court violated their constitutional rights because it did not afford them a fair trial. They make three allegations in this regard. First, they allege that the District Court prevented them from consulting with their attorneys. Second, they allege that the District Court inappropriately based a significant portion of its ruling on the findings of the ASA's executive committee. Third, they contend that the District Court judge was biased against them. We consider each of these allegations independently.

¶29. The Members argue that the District Court prevented them from consulting with their attorneys because the District Court excluded them temporarily from the courtroom when certain evidentiary documents were discussed and, thereafter, prevented them from reviewing the documents by putting the documents under seal. Finally, the District Court forbade the Members from discussing the documents with their attorneys by putting the contents of the documents under protective order. The documents at issue include certain meeting minutes from the ASA's executive committee that involve requests for Z-8 bloodtyping waivers, and a computer printout showing the names of approximately 2200 animals that received such waivers. The District Court determined that these documents should be kept confidential to prevent potential harm to cattle owners who obtained Z-8 waivers and who otherwise would have no chance to defend themselves or their business interests in the proceedings. Accordingly, when the documents were used in the courtroom, nonattorneys were instructed to leave the courtroom. Only in some instances were witnesses who were being questioned and ASA representatives allowed to remain.

¶30. We have recognized that when the public's right to know collides with the right to protect certain private

information, a balancing of rights is necessary and a protective order may be fashioned to achieve this. See Montana Human Rights Div. v. City of Billings (1982), 199 Mont. 434, 448-49, 649 P.2d 1283, 1291. We hold that the District Court appropriately achieved a balance of these interests by keeping confidential the names of cattle owners who obtained Z-8 waivers.

¶31. The Members further allege that the District Court violated its own protective order by specifically naming some of the animals registered with the Z-8 waiver in its findings of fact and conclusions of law. We do not agree. The record shows that the animals named by the District Court were already publicly known to have Z-8 waivers.

¶32. In their second allegation, the Members argue that the District Court inappropriately based a significant portion of its ruling on the findings of the ASA's executive committee. However, we hold that the Members fail to substantiate their claim. The District Court did not use the committee's findings or determinations when it made its own conclusions. The District Court judge stated that he was "not going to be bound by the Special Litigation Committee's finding" and that he would "make [his] own findings." We conclude that he did just that.

¶33. In regard to the Members' third argument, that the District Court Judge was biased against them, we look to § 3-1-805, MCA, for the procedure under which we can remove a district court judge for personal bias or prejudice. Section 3-1-805, MCA, requires that counsel file an affidavit alleging facts showing the judge's personal bias or prejudice thirty days in advance of trial. See In re Marriage of Eklund (1989), 236 Mont. 77, 78, 768 P.2d 340, 341; State v. Langford (1994), 267 Mont. 95, 104, 882 P.2d 490, 495, cert. denied, (1995), 513 U.S. 1163, 115 S. Ct. 1128, 130 L. Ed. 2d 1090. In the case before us, the Members

did not file an affidavit thirty days in advance. Instead, they suggest that they were not aware of the judge's possible bias until nearly four months after the District Court issued its findings of fact and conclusions of law. At that time, they filed the necessary motion and supporting affidavit. Regardless of the thirty-day requirement, we hold that the Members' motion falls short of alleging facts to support their argument that the judge was biased.

¶34. In the alternative, the Members suggest that we should apply the cumulative error doctrine, under which the cumulative effect of several errors could result in an unfair trial. However, we have previously stated that this Court applies the doctrine of cumulative error exclusively in criminal cases. See Baxter v. Archie Cochrane Motors, Inc. (1995), 271 Mont. 286, 289, 895 P.2d 631, 633. We conclude that the Members received a fair trial.

## ISSUE 3

¶35. Should either party be awarded costs and attorney fees?

¶36. We do not agree with the Members' contention that they should be awarded attorney fees under § 35-2-1306(1), MCA. This statute requires a corporation to pay the complainants' attorney fees, even if the complainants are not wholly successful in their claims, if the proceedings result in a substantial benefit to the corporation. Not only does it appear that the Members failed to plead this before the District Court, we hold that the Members' actions have not resulted in a substantial benefit to the ASA. The parties recognize two benefits: one, the ASA obtained more thorough bloodtyping information on the Risinger animals; and two, the ASA executive committee, instead of the ASA staff, now decides all Z-8 waiver requests. These benefits are not substantial.

¶37. The District Court awarded the ASA costs as the prevailing party pursuant to § 25-10-103, MCA. However, it denied the ASA its attorney fees pursuant to § 35-1-547, MCA, holding that this action was not commenced for an improper purpose. More properly, the District Court should not have awarded the ASA attorney fees pursuant to § 35-2-1306(2), MCA, which is the applicable provision pertaining to nonprofit corporations.

¶38. The ASA also urged the District Court to award it attorney fees under the terms of its own bylaws. The ASA's bylaws state:

Although the right or privilege of a member or non-member to seek judicial review of previous Association decisions or actions is recognized, that member . . . does thereby agree, if unsuccessful in the attempt to overturn Association decisions, actions, rules or By Laws, to reimburse the Association for its reasonable attorney fees, court costs and other expenses in defense of such suit.

Under the American Rule, a party in a civil action is generally not entitled to fees absent a specific contractual or statutory provision. See Montana Health Care Ass'n v. Board of Directors of State Comp. Mut. Ins. Fund (1993), 256 Mont. 146, 157, 845 P.2d 113, 120. This Court has recognized that a corporate bylaw serves as a contractual provision. See Appeal of Two Crow Ranch, Inc. (1972), 159 Mont. 16, 23, 494 P.2d 915, 919.

¶39. On several occasions, including the pretrial order, the ASA suggested that any arguments regarding costs and fees should be addressed separately after the dissolution proceedings. Although the District Court adequately addressed other arguments of costs and fees in its findings of fact and conclusions of law in the dissolution proceedings, it did not address the ASA's argument for attorney fees under the terms of its own bylaws. For that reason, we remand to the District Court for consideration of the ASA's argument for attorney fees under the bylaw provision. Should the District Court determine that the ASA is entitled to attorney fees under its bylaws, then a

**hearing should be conducted to determine the amount.**

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART