Dennis G. **MOORE** and George R. Moore, Plaintiffs-Appellees, Cross-Appellants,

v.

**BOATING INDUSTRY ASSOCIATIONS,** Trailer Manufacturers Associations, and Donald I. Reed, Defendants-Appellants, Cross-Appellees.

Nos. 83–2148, 83–2201.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1984.

Decided Jan. 30, 1985.

As Amended Feb. 11, 1985.

Rehearing and Rehearing En Banc Denied March 15, 1985.

---

August E. Roehrig, Jr., Fitzgibbon, Roehrig, Greenawalt & Stone, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Stanley M. Lipnick, Arnstein, Gluck & Lehr, Chicago, Ill., for defendants-appellants, cross-appellees.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and WYATT, Senior District Judge.[*]

COFFEY, Circuit Judge.

This is an appeal from a jury verdict in favor of the plaintiffs, Dennis and George Moore, against two affiliated Marine industry trade associations and one of their employees, Donald I. Reed. The jury found that the defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1,[1] disparaged the plaintiffs' product and violated

---

[*] The Honorable Inzer B. Wyatt, Senior District Judge for the United States District Court for the Southern District of New York, is sitting by designation.

1. Section 1 of the Sherman Act provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is illegal...."

the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, § 261 *et seq.* It returned a verdict on all the claims in the amount of $200,000. On post-verdict motions, the trial court denied the defendants' motions for judgment n.o.v. or a new trial on the issue of the Sherman Act violation, but ordered a remittitur of damages from $200,000 to $167,201. The district court, however, overturned the jury verdict finding that the defendants had committed the common law tort of product disparagement and had violated the Illinois Consumer Fraud and Deceptive Business Practices Act. Judgment was entered in the amount of $501,603 after trebling the $167,201 in damages. The defendants, Boating Industry Associations ("BIA"), Trailer Manufacturers Associations ("TMA"), and Donald I. Reed ("Reed"), appeal the jury verdict contending: (1) that there was insufficient evidence to establish any § 1 Sherman Act violation; (2) that the jury was erroneously instructed as to the law establishing such liability; and (3) that they were "ambushed" by the plaintiffs in their presentation of their damage evidence, or in the alternative, that the evidence presented was legally insufficient. The plaintiffs cross-appeal claiming that the district court erred in granting judgment n.o.v. on its common law product disparagement and Illinois statutory claims. We affirm.

## I.

Before describing the evidence presented in this case, it would be helpful to detail the federal and state regulations which govern the manufacture of boat trailer lights. The Federal Motor Vehicle Safety Standards, 49 C.F.R. Part 571, promulgated by the National Highway Traffic Safety Administration ("NHTSA") of the Department of Transportation ("DOT"), pursuant to the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1391, provide for the regulation of boat trailer lights. One of those standards, Standard 108, regulates the production requirements of tail lights and their associated equipment by requiring not only that boat trailers be equipped with a tail lamp, stop lamp, rear and side reflectors, side-mark lamps, turn signal lamps, and clearance lamps, but also that those lights conform to the photometric or brightness levels promulgated by the Society of Automotive Engineers. *See* 49 C.F.R. § 571.108 S4.1.1.

The DOT does not require the submission of a laboratory test report proving that the light complies with Standard 108, but instead permits self-certification by the manufacturer of the light who may indicate compliance by placing a "DOT" symbol on their lamps. Compliance with DOT's Standard 108 is accomplished either through self-initiated testing by the NHTSA or through a petition to commence a proceeding filed with the NHTSA by "any interested person" (including a manufacturer) who believes that the lighting equipment does not comply with the regulatory standards. 15 U.S.C. § 1412; 49 C.F.R. § 552. If such a petition is filed, NHTSA, within 120 days from the time of filing, must either grant the petition and commence a proceeding by investigation, or deny the petition and publish the reasons for its denial. 15 U.S.C. § 1410a(d). If in a proceeding commenced by NHTSA it is determined that the tail lights marked with the DOT symbols do not conform to Standard 108, the vehicle or trailer manufacturer using the lights will not be subject to civil penalty or recall if such manufacturer can establish that it did not have reason to know in the exercise of due care that the equipment did not conform with federal safety standards. 15 U.S.C. section 1397(b)(2).

Most states generally follow the federal regulatory scheme. However, the states of Virginia and California require affirmative certification by their state officials prior to sale of the lights in their states. The required photometric or brightness levels for tail lights in those states are substantially identical to the federal statutory requirements contained in Standard 108.

One of the plaintiffs, Dennis Moore, testified that he and his father, George Moore, entered the boat trailer light manufactur-

ing business in the early 1970's, their plant being located in Livermore, California. In 1974, they introduced their new "Dry Launch Light Model 701" ("Model 701").[2] This light was certified as being salesworthy by the states of California and Virginia, and by the American Association of Motor Vehicle Administrators. Subsequently, in 1975, the California Highway Patrol ("CHP") purchased a sample pair of the Model 701 light, tested the sample and found that its sidelights were not in compliance with the photometric requirements of Standard 108. Dennis Moore testified that after he was notified that the lamp had failed the test he traveled to CHP headquarters where he explained to the person in charge of the compliance program, a Mr. Sheppard, that because of the unique design of the Model 701, the California authorities had improperly tested these lights.[3] However, subsequent to this encounter he in fact did make certain other changes in the design of the light and submitted a test report to the CHP from a CHP-approved private laboratory stating that the Model 701 complied with the required photometric output. Thereafter, in September of 1976, the CHP conducted further tests and determined that the lights again failed to meet the Standard 108 photometric output requirements. At trial, Dennis Moore explained this discrepancy by stating that the CHP had not tested the improved version of the Model 701, but had in fact tested an earlier model.

At this time, the BIA and TMA (hereinafter "Association") were holding their yearly meeting, which is scheduled to coincide with the annual industry trade show. The industry show is held to enable the manufacturers, distributors, and dealers to make purchases for the forthcoming boating season. Prior to the 1976 trade show,

Donald Reed, Director of Engineering for the BIA and the TMA and administrator of their certification program, received a test report critical of the Model 701 from Wesbar Corporation, a member of the Association which also happened to be the manufacturer of a tail light in direct competition with the Model 701. Wesbar told the Association that a copy of this report had been sent to the DOT and the CHP. Reed called those two agencies and was advised that both the DOT and CHP would purchase the Model 701 on the market and conduct their own separate tests.

The Moores assert that the unlawful conduct commenced at the time of the Association's annual meeting held on September 29, 1976. Reed testified that while addressing members at the Association meeting, he was questioned from the floor by a representative of E-Z Loader about government investigations involving several boat trailer lights. He insisted that only after being pressed did he mention that the Model 701 light was under investigation as were two other manufacturer's tail lights. He further testified that he did not contact the Moores after the meeting since he was advised by his lawyer that the Moores desired that all further communications be made to their attorney.

A Mr. Gromlovitz, a boat trailer manufacturer who testified for the plaintiffs, stated that he was present during the Association's meeting. He testified that at this meeting Mr. Reed stated, in response to a question from the floor, that the 701 light was not DOT approved. Mr. Gromlovitz stated that he was told by an Association official the following day that if his company used the Model 701 on his trailers, the Association would deny his trailers the Association's certification. He attend-

---

**2.** This model consisted of seven separate lights. The defendant also marketed several other lights, including a "Model 501" light that consisted of five different functional lights.

**3.** At trial, there was a disagreement between the parties over whether this testing by the CHP was properly performed wherein the main lens of the tail light was masked while the sidelight was

being tested for its photometric output. To test the sidelight lamp, it was the usual procedure to mask the tail light lens. However, because of the design of the 701, the tail light lamp was to be used to increase the photometric output of the sidelight lamp. It was established at trial that the law allows the testing of the sidelight without masking the tail light lamp.

ed the trade show and was present at the Association's meeting since he had been advised by others in the industry of the prestige and importance in belonging to the Association and, apparently, he believed that Association membership and participation in its certification program would enhance the sales of his product.[4] He testified that he had designed a trailer specifically for use with the Model 701 light, and that he was pleased, as were others in the industry, with the 701's performance and resistance to water.[5] According to Mr. Gromlovitz, the Model 701 was especially effective for use with his company's "drive-on" trailer, which could be backed into and submerged in the water. These trailers were new to the industry in 1975 and 1976.

On the day after the Association's meeting, Dennis Moore was informed by Mr. Gromlovitz of the Association's statement concerning the lack of DOT approval. He testified that he immediately went to the Association headquarters at the convention to get an explanation of the problem and brought with him copies of the 701's certifi-

cation of approval from the states of California and Virginia. He further testified that he gave the Association the phone numbers of the various governmental agencies that would verify their approval of the Model 701 and further stressed to the officials the importance that the matter be resolved while the convention was in progress. Association officials assured him they would look into the matter; however, Moore stated that they never contacted him even though he made subsequent efforts during the show to speak with the Association representatives in an attempt to resolve the matter. He further testified that he called the CHP and was advised his certification was still valid, but that the lights were being tested.[6] In October of 1976, the Association sent a single Model 701 light to a private testing laboratory in Ann Arbor, Michigan. Moore testified that the model the Association sent for testing was improperly assembled.[7] The Association also sent a pair of Model 701 lights to the CHP in November of 1976. The CHP's

4. Apparently because sales to dealers at trade shows are often made in a package (boat, trailer, etc.) it helped to have the entire "package" approved by the Association. However, the parties dispute the interpretation to be placed upon portions of Mr. Gromlovitz's testimony. When asked if it was important that his company participate in the TMA certification program, Mr. Gromlovitz responded "[o]h, yes, mainly because boating manufacturers had asked us to join the BIA and TMA." The defendants stress that Gromlovitz was referring to the importance of membership in the organization and not participation in the certification program. However, as explained by Reed, the certification program was known at various times as the "BIA" and "TMA" certification program. Further, Gromlovitz's answer was in direct response to a question inquiring as to the importance of the certification program. Finally, Gromlovitz later testified that he expressed his concern to an Association official regarding the effect of Reed's statement at the meeting, "I said, 'I am concerned because we have developed a boat line trailer around the Dry Launch light. We have to be certified and I can't be certified using that Dry Launch light. . . .'"

5. Mr. Gromlovitz's company which manufactured "Rebel" trailers, filed for bankruptcy in the following year. Gromlovitz's company continued to use the Model 701 even after being

told its trailer would not be certified, apparently because the trailer was already designed specifically to incorporate the Model 701. The plaintiffs suggest that the denial of the participation in the certification program led to his company's financial demise. Mr. Gromlovitz, however, was not sure what had happened to the company since he had left it within the interim, but he thought that the company was in "pretty good shape" when he left. However, Gromlovitz left his company six months after the Association's September 1976 meeting denying certification to any trailer that used the Model 701. Thus, the full effects of the Association's conduct may not have been felt by the company at that time, and the jury certainly could infer that denial of the certification may have helped caused its financial demise.

6. It was at this time that he went to the CHP headquarters in Sacramento, California and, upon inspecting the lights under examination, told the CHP officials that the lights they were testing were the old version and not the improved version of the light.

7. Mr. King, the person who performed the test at the Ann Arbor facility, indicated that the Model 701 may also have been improperly tested as the back lens again was masked, thus decreasing the photometric output of the sidelight.

report indicated that the light failed to meet the requisite photometric requirements. After being advised by the CHP as to the test results, Moore traveled to Sacramento and, after examining the lights, pointed out to the officials that the right and left rear lamplights had been improperly inverted before testing. Thus, the test results were rejected by the CHP and the lights were once more tested in early January, 1977. In March, 1977, the Moores received a letter from the CHP stating that the lights complied with the photometric requirements.[8]

On January 17, 1977, the Association sent a letter to the Moores stating that it had received information regarding the failure of the Model 701 light assembly to comply with Standard 108 on two separate occasions.[9] The letter went on to state that the Model 701 would not be certified by the TMA and that it would notify TMA members that they could not use the light if they wished to continue with their TMA certification. The letter invited a response from the Moores, but none was forthcoming. Then on February 3, 1977, Reed and the Association issued a "Technical Bulletin" stating that the TMA would refuse to certify any trailers using the "Dry Launch Model 701" light. After learning of the substance of this Technical Bulletin from another source, the Moores commenced this litigation in April of 1977. Reed testified that after learning in October 1978 of the California approval of a redesigned Model 701, the Association issued another Technical Bulletin approving the Model 701

for trailers participating in their certification program.

The plaintiffs introduced, through the use of exhibits, numerous letters to other trailer light manufacturers from the CHP warning those manufacturers of their non-compliance with Standard 108. In fact, Mr. Sheppard, the CHP Director of Engineering, testified that approximately 55% of the lights tested failed to meet the requirements of Standard 108. Mr. Reed admitted on cross-examination that, prior to the time more stringent controls for testing were instituted in 1978, an Association certified trailer could contain a tail light whose certificate of approval had been previously revoked by one of the states that tests these lights. Reed also admitted that the only company the Association had taken action against for alleged failures to comply was the plaintiffs' company. In fact, even Wesbar, their competitor that submitted the non-compliance report to Reed, was having compliance problems with its own light during 1976 and had experienced problems before. When Dennis Moore later informed Reed of the compliance problems with Wesbar's lights in 1978, Reed responded by stating that he had contacted Wesbar regarding the problem and whatever problem there had been with the light apparently had been resolved. As the district court found in its order denying the defendants' motion for judgment n.o.v.:

> "[t]hey had no procedure to follow in those circumstances because their role had been primarily to facilitate compli-

---

**8.** Apparently a mistake was made by the CHP in its March 1977 letter in that several of the tests indicated the sidemarker lights did not fully comply with Standard 108. The Moores subsequently received another letter in March 1978 stating that the lights were in fact not in complete compliance with the applicable standards.

**9.** In their brief, the defendants state that CHP retesting, which occurred in January of 1977, conclusively demonstrated that the lights were not in compliance with the standards, thus inferring that it had a legitimate reason to deny certification. However, the evidence discloses that the Association had no knowledge of these tests at the time it sent its letter to the Moores at the end of January, 1977 stating that it would

not certify any Association member's product if it used the Model 701 light. The letter referred to two tests—one conducted in October of 1976 by the private laboratory in Ann Arbor and the other conducted in November of 1976 by the CHP—in which those lights sent for testing were found to be improperly assembled. It is apparent that the Association did not rely on the January 1977 test in denying certification, but instead relied on the two previous tests where the lights sent for testing by the Association had been improperly assembled. Thus, at the time of the March 1977 letter, both the Moores and the CHP, as evidenced by the March 1977 letter, believed that the Moore's light was in compliance.

ance and the ability of manufacturers to certify compliance. Reed was not familiar with federal defect investigations. He never dealt with them because 'we haven't gone out and tried to make any trouble with my manufacturers by filing any complaint with them'."

In April of 1978, the Moores were deposed by the defendants for two days concerning their business operations. Information that could not be provided, obviously, were the sales figures for the Dry Launch lights during the years 1978 to 1981. At trial, Dennis Moore testified that he calculated his damages with a comparison of the differential in unit sales between the periods 1976 through 1979 and 1979 through 1981.[10] He also computed his average profit on the Model 701 for the period 1976 through 1979 as $2.78 per unit. He multiplied the lost unit sales by the lost profit to arrive at the $85,226 damage figure. As to the second element of his damage claim, Mr. Moore claimed that had he been allowed to make the original sales to the Association members, he would have sold additional lights in both the after-market [11] and in the replacement market. He testified that since the sales in these markets were not as price competitive, his profit would have been $3.82 per pair of lights sold. To arrive at the total lost profits for after-market sales, he multiplied this amount by his estimated lost unit sales to arrive at an additional $81,976 in lost profits. Moore's total identifiable loss was $167,202 in lost profits.

At trial, the defendants claimed that they were unduly prejudiced by Mr. Moore's damage testimony since the plaintiffs had failed to update their responses to the defendants' interrogatories requesting the plaintiffs to list their damage claims. The defendants also asserted that the plaintiffs violated a pretrial order prohibiting testimony as to special damages. The district court judge, being sensitive to the defendants' claims of prejudice, made extraordinary provisions during the trial to allow the Moores' sales ledgers to be flown to Chicago in order that defendants would have an opportunity to examine them. He also allowed the defendants to depose Dennis Moore during the trial over the weekend and to recall Moore for further cross-examination. On cross-examination, Dennis Moore stated that during the period of time that Association members were not purchasing the Model 701, E–Z Loader, a boat trailer manufacturer and Association member, did purchase Model 500 lights from the Moores in 1978. The Association contended at trial that the Moores sold 19,000 lights to E–Z Loader; however, Moore disagreed that the sales were that large. He further testified that once members again began to purchase the Model 701, its price was cut from $6.74 to $4.50 per pair because of the increased purchases.

## II.

### A. Liability for Conduct.

Whether applying a rule of reason or *per se* analysis, the defendants assert that their conduct was not an unreasonable restraint

10. The unit sales for the Model 701 were:

| | | |
|---|---|---|
| Model 701 introduced into the market during the year 1974. | 1974 | 50–100 pr. |
| | 1975 | 750 pr. |
| Sept. 29, 1976—Meeting of the Association. | 1976 | 856 pr. (820 for three quarters prior to statements) |
| | | 36 pr. (last quarter after statement) |
| | 1977 | 360 pr. |
| Oct. 11, 1978 Technical Bulletin advising Association members that Model 701 was approved for use on members' trailers. | 1978 | 244 pr. |
| | 1979 | 1,042 pr. |
| | 1980 | 6,188 pr. |
| through September | 1981 | 25,246 pr. |

11. These are sales that take place in the dealers' showrooms or at various trade shows and are spurred by lights that are on the boat trailers. People see these lights that are associated with a successful product and are inclined to purchase those lights when they are in the market to make a tail light purchase.

of trade.[12] However, even if we find the defendants' conduct was an unreasonable restraint of trade, they further assert that the other element of a Sherman Act § 1 violation—an agreement, combination or conspiracy—is absent in this case.

■ Mr. Gromlovitz, testifying for the plaintiffs, stated in effect that he considered membership in the BIA and TMA and participation in the certification program a prime ingredient for success as a boat trailer manufacturer. Mr. Reed also testified that he could not recall any one major manufacturer or distributor who was not a member of the Association.[13] Further, the record shows a sharp decrease in Model 701 sales to members of the Association after the Association threatened the revocation of certification for any member using the plaintiffs' product. From this evidence, it is apparent that the certification program possessed market power. *See Phil Tolkan Datsun v. Greater Milwaukee, Etc.*, 672 F.2d 1280, 1286 (7th Cir. 1982) (failure to demonstrate the market power of an association fatal to a *per se* claim). It is clear that when an association takes on the responsibility of self-regulation by issuing a certificate of approval, that certification must be equally available to qualifying association members and non-

association companies. *See, e.g., Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277 (3d Cir.1978). Because of the complete lack of due process afforded the plaintiffs and their product by the Association in reviewing the Model 701's qualifications and the discriminatory manner in which certification was denied, the certification was not equally available and thus we believe the defendants' conduct in this case falls within the holdings of *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (and its progeny, *see, e.g., McCreery Angus Farms v. American Angus Ass'n*, 379 F.Supp. 1008 (S.D.Ill.1974), *aff'd, (unpub. order)*, 506 F.2d 1404 (7th Cir.1974)), and *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961).

■ In *Silver*, the defendant, New York Stock Exchange, summarily ordered all members to cut all communication wires connected to the plaintiffs. The plaintiffs were individual over-the-counter traders who needed those connections in order to trade. No prior notice or opportunity for a hearing was given to the plaintiffs detailing the reasons for the cessation of business. One of the plaintiffs was allegedly forced out of business while the other's

---

12. Much has been written recently in this circuit concerning the applicability of the *per se* analysis to alleged "group boycotts." *See, e.g., Phil Tolkan Datsun v. Greater Milwaukee, Etc.*, 672 F.2d 1280 (7th Cir.1982); *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781 (7th Cir.1981). Thus, we do not believe that it is necessary for us to go into an extended discussion describing the differences between the *per se* versus rule of reason analyses. Suffice it to say both "are employed 'to form a judgment about the competitive significance of the restraint.'" *N.C.A.A. v. Bd. of Regents of Univ. of Okl.*, — U.S. —, 104 S.Ct. 2948, 2962, 82 L.Ed.2d 70 (1984) (*quoting National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). Traditionally, *per se* treatment is reserved to that type of conduct which courts have had experience with and have found to have a pernicious effect on competition, while the rule of reason analysis requiring an evaluation of the effect of the conduct upon the relevant market is reserved for all other types of challenged activity.

In assessing the conduct of the defendants in implementing their certification program, the

district court commented "[i]f such programs are carried out arbitrarily and unreasonably, however, to call that a *per se* violation because it is a naked restraint or to call it a violation because it is an unreasonable restraint seems to be of little moment." Certainly where there has been a full-blown trial assessing the validity of the defendants' conduct, it does indeed become less important whether we label the conduct a *per se* violation or a violation of the rule of reason. In instances where exclusionary action is taken and justified by reference to industry self-regulation, which may make it more difficult for a firm to compete, "the scope of the analysis is so spacious as it matters little whether the inquiry is described as one aimed at determining whether a *per se* rule governs or is one in which the rule of reason is being applied...." L. Sullivan, *Handbook of Antitrust*, § 88, at 247–48 (1977).

13. The district court concluded:
"There is no dispute here that the manufacturers were operating in a national market...."

business was greatly diminished. *Silver*, 373 U.S. at 344–45, 83 S.Ct. at 1250. *Silver* did not automatically condemn the Exchange's actions as a *per se* violation. Instead it recognized that the Exchange's actions would violate § 1 of the Sherman Act "absent any justification derived from the policy of another statute or otherwise...." *Silver*, 373 U.S. at 348–49, 83 S.Ct. at 1252–53. This became known as the *Silver* "exception," as subsequently labeled by this and other circuits. *See, e.g., U.S. Trotting Ass'n v. Chicago Downs Ass'n., Inc.*, 665 F.2d 781, 789 n. 14 (7th Cir.1981) citing *McCreery Angus Farms v. American Angus Ass'n.*, 379 F.Supp. 1008, 1019 (S.D.Ill.1974), aff'd. (unpublished order), 506 F.2d 1404 (7th Cir.1974); *see also Pacific Stat. & Printing v. Northwest Wholesale*, 715 F.2d 1393, 1397 (9th Cir. 1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 1905, 80 L.Ed.2d 455 (1984).[14] Under this exception, an industry's attempt at self-regulation will be evaluated under the rule of reason, and will usually be found lawful (L. Sullivan, Handbook of Antitrust, § 88 at 253), as long as procedural safeguards are employed to assure that the restraints are no more extensive than necessary to accomplish the association's legitimate purpose. *Id.; see also, Silver*, 373 U.S. at 364–67, 83 S.Ct. at 1260–62.

■ In holding the Exchange liable, *Silver* noted that by failing to accord plaintiffs due process "the Exchange has plainly exceeded the scope of its authority under the Securities Exchange Act to engage in self-regulation and therefore has not even reached the threshold of justification...." *Id.*[15] In noting the importance of a proper review by the sanctioning organization prior to its denial of a valuable service, *Silver* stated "[i]n addition to the general impetus to refrain from making

---

**14.** In *Trotting*, the sanctioning organization, the United States Trotting Association ("USTA") urged its members, who were owners of race horses, to boycott two racetracks that had failed to join the USTA but were still enjoying the benefits of affiliation provided by that organization. Our court held that the *per se* rule of liability was improper. *Trotting* initially noted that there was no showing of a purpose to exclude competitors, and that a *per se* rule was inappropriate where the plaintiffs had been "free-riding" by enjoying the benefits without joining the organization. *U.S. Trotting Ass'n.*, 665 F.2d at 788–89. The second basis for applying a rule of reason analysis was that the USTA's conduct fell within the "*Silver* exception" in that the level of restraint imposed on trade was of necessity required in order that it might accomplish the USTA's legitimate purpose. *Id.* at 789–90. Similar to the USTA in *Trotting*, the Association, in this case, urged its members not to deal with the plaintiffs. However, in this case, the jury obviously found that the Associations' conduct did not fall within the "*Silver* exception" because of the arbitrary manner in which the sanctions were imposed upon the plaintiffs' product. Further, as discussed later in the opinion, the jury in this case could well have determined that there was an anticompetitive purpose behind the Association's actions. *See infra* note 23.

Recently, a panel of this court rejected a plaintiff's request for a preliminary injunction where the plaintiff (a gem appraiser) had been expelled from an association after violating a by-law prohibiting the use of a fixed percentage fee for appraisal work. *See Vogel v. American Society of Appraisers*, 744 F.2d 598 (7th Cir. 1984). We mention *Vogel* only to note that the issue facing that panel (i.e., enforcement of trade association by-laws) is far different from the issue facing this panel (i.e., arbitrary exclusion of a product from the market by a trade association).

**15.** After holding that the self-regulation imposed upon the Exchange by the Securities and Exchange Act of 1934 did not exempt the Exchange from the anti-trust laws, *Silver* stated:

"[T]he collective refusal to continue the private wires occurred under totally unjustifiable circumstances. Notwithstanding the prompt and repeated request, the petitioners were not informed of the charges underlying the decision to invoke the Exchange rules and were not afforded any appropriate opportunity to explain or refute the charges against them." *Silver*, 373 U.S. at 361, 83 S.Ct. at 1259. The Court went on to state that "it is clear that no justification can be offered for self-regulation conducted without provision of some method of telling a protesting non-member why a rule is being invoked so as to harm him and allowing him to reply in explanation of his position." *Id.* "Indeed, the aims of the statutory scheme of self-policing ... are defeated when an exchange exercises its tremendous economic power without explaining its basis for acting, for the absence of an obligation to give some form of notice and, if timely requested, a hearing creates a great danger of perpetuation of injury...." *Id.*

unsupportable accusations that is present when it is required that the basis for charges be laid bare, the explanation or rebuttal offered by the non-member will in many instances dissipate the force of the *ex parte* information upon which an exchange proposes to act." *Id.* at 362, 83 S.Ct. at 1259. "Hence the affording of procedural safeguards not only will substantively encourage the lessening of anti-competitive behavior outlawed by the Sherman Act but will allow the anti-trust court to perform its function effectively." *Id.* at 363, 83 S.Ct. at 1260. Thus, by focusing on the use of *ex parte* information, the absence of input by the censured non-member, and the failure to explain the decision reached, *Silver* certainly requires that before a business association takes action which will affect a non-member's ability to compete in a particular market, some sort of notice and hearing must be provided in order to prevent abusive practices by an organization that wields considerable market power. Courts will normally not intrude into the decision-making process of a trade organization so long as these minimal protections are provided. *See McCreery Angus Farms*, 379 F.Supp. at 1010–11; *see also* L. Sullivan, *Handbook of Antitrust*, § 88 at 253. However, where the affected party is not allowed to present its case in defense of its product prior to imposition of sanctions and where adopted industry standards are applied in a discriminatory manner (*see Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 658–59, 81 S.Ct. 365, 366–67, 5 L.Ed.2d 358 (1961)) [16] and a competitor is thus harmed in the market in which he seeks to compete, liability will attach.

In applying the controlling precedent just discussed, we must assess the record presented in this case and consider the evidence and its inferences in the light most favorable to the plaintiffs in deter-

mining whether the defendants were entitled to judgment n.o.v. *See, e.g., William Inglis, etc. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981). On paper the certification program itself is a commendable effort on the part of the Association to promote compliance with the federal standards; however, the record discloses, and the jury certainly was entitled to infer, that the implementation of that program was arbitrary and denied the plaintiffs' Model 701 even minimal due process prior to the sanction imposed.

Concerning the lack of due process afforded the plaintiffs' product, Mr. Gromlovitz testified that during the Association's meeting in September, 1976 [17] Mr. Reed stated that the Model 701 was not DOT approved. Reed's statement was based upon an unsubstantiated and *ex parte* report submitted to Reed from a competitor of the plaintiffs and member of the Association's certification committee, the Wesbar Corporation, and without doubt helped to convince the jury that the decline in the Model 701 sales during the latter portion of 1976 was attributable to his statement. *See* note 10. Dennis Moore also testified that after he heard what had transpired at the meeting he went to the Association booth with the Model 701's compliance certificates in hand. He was told by an official of the Association that they would look into the matter; however, Moore never heard anything further. Reed, on the other hand, testified that he understood that all subsequent contacts after the September trade meeting were to be through the attorneys for either side. However, as the district court found in assessing the jury's verdict, "[f]ollowing the meeting there appears to have been no real effort to discuss with the Moores the possible areas of noncompliance and the means of assuring compliance, although the adversarial posture of

---

16. In *Radiant Burners,* the Court held that the alleged discriminatory treatment in issuing a seal of approval to a non-member of the defendant association stated a valid cause of action under § 1 of the Sherman Act; *see also, Eliason Corp. v. National Sanitation Foundation,* 614 F.2d 126, 129 (6th Cir.1980).

17. The trade show, where the meeting took place, is the boating industry's showcase where the major purchasing contracts for manufacturers and dealers are negotiated.

the matter from and after the meeting leaves it unclear whether such an approach was thereafter feasible." The Association did test the Model 701 to determine if it met the required photometric output requirements, but this testing occurred after the damaging statements had been made. This testing, which was not only performed improperly since the masking covered too much of the light but also performed on misassembled lights, was cited in the Association January 1977 Technical Bulletin as the reason for the denial of certification for the Model 701.[18]

It was also established that many manufacturers of boat trailer lights had experienced similar noncompliance problems that the Model 701 had experienced. Yet, their certificates of approval, like the Model 701's certificate, were never withdrawn by the State of California, apparently because the deficiencies were not considered of such a severity to warrant revocation of the state's compliance certificate or they were corrected in a timely manner. In fact, it was revealed at trial that 55% of all lights tested by the CHP failed inspection. It was also revealed that Wesbar, an Association member, which was on the certification committee and submitted the report to Reed, had experienced similar problems in the past with the photometric output requirements. In that case, the Association sent a letter to Wesbar suggesting that if there was a problem the lights should be brought into compliance. However, upon receipt of the information, the Association did not conduct independent tests on the product or revoke Wesbar's certificate of approval for lights to be used on members' trailers; rather it contacted Wesbar and was assured by them that the compliance problems had been rectified. The plaintiffs also point to the BIA's certification program for its members trailers, which also followed federal Standard 108, where if

upon reinspection by the Associations (such reinspection being performed on a regular basis) defects are found, the matter is taken up with the manufacturer, corrections made, and the product continues to be included in the certification program. As admitted by Reed on cross-examination, the only product ever sanctioned by the Association was the Model 701. The district court accurately summarized the evidence when it found that

> "[t]he Association and Reed had never inquired of anyone as to whether they had any information respecting other lights. They had not inquired of California as to its judgment as to whether compliance was so substantial as to jeopardize certification. The Moores were not advised of the intention to test these lights and therefore were unable to participate in any way in assuring themselves that the tests were properly conducted upon properly submitted lights. Indeed, they strenuously contended that the subsequent tests had been improper."

In fact, the regulatory procedures in effect at that time provided for the fair and expeditious resolution of the problem. The DOT is required by law to grant or deny, within 120 days, petitions by interested persons filed in respect of alleged non-conforming lights, and to state its reasons for denying a petition. *See* 15 U.S.C. 1410a; 49 C.F.R. § 554. If the DOT does investigate, a hearing is held where both sides are given a chance to present their case. *Id.* The Association apparently chose not to pursue this approach because, according to Reed, it would have been too time consuming. However, should an association of this nature decide to forego the legally established procedures, the least it should have done was to assure that the protec-

---

**18.** The Association did send a letter dated January 17, 1977 to the plaintiffs telling the plaintiffs of the results of the Association's testing and inviting them to respond. The jury was free to reach the conclusion that this letter, given all that had occurred prior to its issuance, was not sufficient to establish the minimum due process

protection. Further, it was only two weeks after mailing this letter that the Association, without apparently waiting for a response, sent out their Technical Bulletin threatening the revocation of its certification of approval for any member's trailer using the Model 701.

tions set forth in the federal statutes were afforded to the plaintiffs.

Finally, the Association argues that the photometric problems the plaintiffs had with the side marker light justify its conduct. However, those photometric problems were similar in nature to those experienced by other manufacturers of tail lights and do not excuse the Association's arbitrary application of its certification program that deprived the plaintiffs of the opportunity to develop a market for the Model 701. As the *Silver* Court noted, "[s]ince ... the Exchange can offer no justification ... for its collective action in denying petitioners the private wire connections without notice or opportunity for hearing ... there is no occasion for us to pass upon the sufficiency of the reasons which the Exchange later assigned for its action." *Silver*, 373 U.S. at 365, 83 S.Ct. at 1261.

The defendants attempt to distinguish *Silver, Radiant Burners*, and the cases following those cases on the basis that there was no "total foreclosure from dealing with members of the TMA." Defendants reply brief at 18. However, it is clear from the figures presented at trial that the Association members were not purchasing the Model 701, as evidenced by the sales to Association members that dropped to 36 pairs during the later portion of 1976.[19] The defendants further argue that there was no market foreclosure since the plaintiffs made sales of their other models to several Associations members beginning in 1978. However, as previously noted, the sale of other tail light models to Association members cannot and does not legiti-mize the Association's conduct in threatening to revoke its certificate of approval if members used the Model 701. *See Silver*, 373 U.S. at 348–49 n. 5, 83 S.Ct. at 1252–53 n. 5. According to Gromlovitz, the Model 701 represented a new generation of lights that was especially resistant to water damage. Further, the record demonstrates that the Model 701, a seven-function light incorporating in one casing all of the federal regulatory lighting requirements, was introduced into the market in late 1974. Even considering the fact that the plaintiffs made sales of their other models in 1978 to Association members, this does not account for the fact that the Model 701 was a new product and that the plaintiffs were in essence precluded for a period of three years (1976 through 1978) from developing a market for direct sales of the Model 701 to trailer manufacturers.

Section 1 of the Sherman Act also requires that unlawful conduct result from a "contract, combination in the form of trust or otherwise, or conspiracy ...." 15 U.S.C. § 1. The defendants assert that even if their conduct is considered an unlawful restraint of trade, no proof was presented establishing that a contract, combination or conspiracy existed, and thus the jury verdict must be overturned. We disagree and note that there is sufficient evidence in the record to demonstrate that the members acted in response to the threat by the defendants to revoke the members' certificate of approval if they used the Model 701; thus, the necessary concerted action was established.

---

19. The defendants' attempt to distinguish *Silver* and *Radiant Burners* fails to convince us since, carried to its logical extreme, the basis for distinguishing these cases would be the difference between no unit sales and a one unit sale. The fact that the plaintiffs' ability to compete against other tail light manufacturers in selling to trailer manufacturers in the Model 701 prototype market was substantially impaired is sufficient. *See Silver*, 373 U.S. at 344–45, 348 n. 5, 83 S.Ct. at 1250–51, 1252 n. 5 (where the Court noted that one of the plaintiff's businesses was substantially impaired); *Associated Press v. United States*, 326 U.S. 1, 17–18, 65 S.Ct. 1416, 1423– 1424, 89 L.Ed. 2013 (1945) (where Court noted the effect of the Associated Press' by-laws put non-members at a competitive disadvantage). *See also, Assoc. Gen. Contractors of Cal. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 528–29, 103 S.Ct. 897, 903–04, 74 L.Ed.2d 723 (1983) ("An agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market."); *Indiana Federation of Dentists v. FTC*, 745 F.2d 1124, 1137 (7th Cir.1984) (no *per se* group boycott where member dentists were willing to deal with insurers so long as insurers reviewed the complete patient treatment file).

The defendants assert that in cases such as *Silver, U.S. Trotting Ass'n.* and *McCreery Angus Farms*,[20] the requisite agreement was established from the fact that members of the organizations involved were subject to their organization's by-laws. The Association would distinguish this case on the basis that their members participation in the certification program was voluntary. However, in *U.S. Trotting Ass'n* the requisite agreement was established through that association's reminding its members of the bylaws prohibiting members from racing their horses at non-USTA tracks. Members who violated this prohibition were subject to the revocation of their racing certificates. *See U.S. Trotting Ass'n,* 665 F.2d at 785, 788. This threatened sanction and the members' response provided the requisite concerted action. *See id.* at 788.[21] *See also, Gibson v. F.T.C.,* 682 F.2d 554, 568 (5th Cir.1982). The Association, however, argues that it was Reed's unilateral decision to deny certification to members using the Model 701 and that the record is bare of evidence that any other association member participated in the decision. Appellants' brief at 21. Reed, however, as the director of engineering, was acting on behalf of the Association that had cloaked him with the apparent authority necessary to act on its behalf. *See Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). The members of the Association had agreed upon a certification program in an attempt to regulate themselves. Similar to the situation in *Trotting,* where the USTA gained compliance through the use of sanctions, Reed stated that Model 701 was not DOT approved and subsequently issued a Technical Bulletin advising the Association's members that certification would be denied to their products if they installed the Model 701 lights on their trailers. The members responded by not purchasing the Model 701 with the obvious effect of a drastic decline in the sales of Model 701. Nonetheless, the defendants assert that the reason their members did not purchase the Model 701 was the fact that they were afraid of government sanctions, such as a recall, if they used the "non-complying" light, and thus they engaged in a unilateral decision not to use the plaintiffs' light. However, it was the Association's January 1977 Technical Bulletin threatening revocation of the Association's certificate of approval, which the evidence discloses was a valued item used by manufacturers for marketing purposes, that was used as the mechanism to enforce the Association's will. This threat and the subsequent action on the part of the Association members in refusing to purchase the Model 701 is enough to establish the necessary concerted action.[22] Of

---

20. It appears that in these cases, the courts are more willing to find the requisite agreement when the Association or trade organization was involved because these organizations typically act on behalf and for their members. Indeed, *McCreery* noted in passing that "[t]he mere involvement of an association generally would provide the requisite element of combination or conspiracy." *McCreery Angus Farms,* 379 F.Supp. at 1017. *See also,* Van Kalinowski, *Antitrust Laws and Trade Regulations,* ¶ 61.01[2] (1981); Symposium, *Trade and Professional Associations: The Antitrust Combat Zone,* 46 Antitrust L.J. 638, 640 (1977).

21. As noted in *U.S. Trotting Ass'n,* "the term group boycott is ... a very broad label for divergent types of concerted activity." 665 F.2d at 788 (*quoting Mackey v. Nat'l. Football League,* 543 F.2d 606, 619 (8th Cir.1976)), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *See also, St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 552, 98 S.Ct.

2923, 2935, 57 L.Ed.2d 932 (1978). The question faced in *U.S. Trotting Ass'n.* was whether the type of conduct engaged in by the association fell within the confines of the *per se* or rule of reason analysis. *U.S. Trotting Ass'n.,* 665 F.2d at 788–89 and n. 11.

22. The defendants argue in their reply brief at 26 that where circumstantial evidence is used to establish conspiracy that evidence "must be inconsistent with any other rational conclusion." *Weit v. Continental Ill. Nat. Bank & Trust Co.,* 641 F.2d 457, 463 (7th Cir.1981) (*quoting Pevely Dairy Co. v. United States,* 178 F.2d 363, 367 (8th Cir.1949)). The *Weit* decision is distinguishable on several grounds. First, *Weit* was a price-fixing case in which the court determined that parallel behavior on the part of competitors regarding the pricing of fungible goods was not enough to establish an illicit conspiracy. The standard mentioned in *Weit* encompassed establishing first that an agreement was present and

course, the "agreement" by itself is not sufficient to establish a § 1 Sherman Act violation. However, we hold that the record demonstrates sufficient unlawful conduct to establish a § 1 Sherman Act violation and thus it was proper for the district court to deny the defendant's motion for judgment n.o.v.

### B. Jury Instructions.

The jury was instructed in part:

"A combination or conspiracy involves an agreement, understanding or concertive action between two or more persons to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means.... It is not necessary for all persons involved in an illegal combination or conspiracy to be named as defendants but only that the named defendants be part of an illegal combination or conspiracy with others.

"*A trade association is by its nature involved in concerted action....*

\*   \*   \*   \*   \*   \*

"All restraints of trade are not necessarily unreasonable. Trade associations may set standards which are restraints but which, if fairly and objectively established and applied, are not unreasonable restraints of trade.

"*If you find* by a preponderance of the evidence *that the defendant associations* in denying approval to the use of Dry Launch boat lights in their certification program *acted for an anticompetitive purpose or in an unreasonable and arbitrary manner, you should find for the plaintiffs* on their Sherman Act claim.

"*If on the other hand the defendant associations* in denying that approval *acted fairly and reasonably to implement their certification program, you should find for defendants* on the antitrust claim."

The defendants object to the italicized portion of the jury instructions. Specifically, they assert that the district court omitted from the jury instruction the § 1 Sherman Act element of a contract, combination or conspiracy, when it instructed the jury that a trade association is, by its nature, involved in concerted action. The defendants also object, contending that the district court did not allow the jury to determine the issue of whether the defendants' conduct actually restrained trade, and further the district court erred when it failed to instruct the jury to assess the defendants' conduct in terms of its impact upon the competitive condition in one or more of the relevant markets. In reviewing the ade-

---

second that it included an unlawful objective. Further, the *Weit* decision relied upon the *Pevely Dairy Co.* case, which involved a criminal prosecution for a § 1 Sherman Act violation. The standard of review used by the *Pevely* court in reviewing the sufficiency of the evidence was the "hypothesis of innocence" test. However, this test has been rejected by this circuit in *United States v. Moya,* 721 F.2d 606, 609–10 (7th Cir.1983). The defendant, at oral argument, also cited the recent Supreme Court's decision in *Monsanto Co. v. Spray-Rite Services Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) and the Court's language that "[t]here must be evidence that tends to exclude the possibility that a manufacturer and non-terminated distributors were acting independently." However, *Monsanto* and the cases it cites involved proving the conspiracy between distributors and a manufacturer to set resale prices, rather than a trade association whose members have explicitly agreed to form an organization to accomplish a specific purpose. Even if a modified

*Monsanto* standard is appropriate in this case (i.e., there must be some evidence to exclude the possibility that the Association members were acting unilaterally) we believe it is present where the evidence shows that the certification had market power and the members stopped purchasing the Model 701 after the Association threatened the revocation of that certificate if it was used on any member's product.

The defendants also assert that since the plaintiffs did not identify the members who refused to purchase Model 701 lights from them, it is possible that their decline in sales was due solely to one member (E–Z Loader) refusing to make purchases. Even accepting this, at best, speculative inference, it does not account for the fact that the Model 701 was a new product entering into the market for use on submergeable trailers and that Association members which had previously not dealt with the plaintiffs would not, after the threatened revocation of certification, do business with the plaintiffs.

quacy of the jury instructions this circuit recently stated that

"[W]e must look to the instructions as the whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well. Even if we should discern error in one or more of the instructions we will not reverse a judgment ... unless we are persuaded the jury's understanding of the issues was seriously affected, to the prejudice of the plaintiffs. *See e.g., Beard v. Mitchell,* 604 F.2d 485, 498 (7th Cir. 1979)."

*Wilk v. American Med. Ass'n.,* 719 F.2d 207, 218–19 (7th Cir.1983). It is in this light that we will review the district court's jury instructions.

■ As to the defendants' latter contention, they assert that the district court erred when it did not instruct the jury on the issue of whether the defendants' conduct had actually restrained trade. We disagree and hold that these instructions were consistent and comport with the Supreme Court's decisions in *Silver* and *Radiant Burners* and this circuit's decision in *McCreery. Radiant Burners* and *McCreery,* especially recognize that an association that attempts to regulate its members' conduct by imposing industry-wide standards may also restrain trade. Once it is established that an association wields market power in setting or enforcing industry standards, it is the arbitrary application of those standards (*Radiant Burners,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961)) or the lack of minimal due process (*Silver,* 373 U.S. at 361–63, 83 S.Ct. at 1259–60; *McCreery Angus Farms,*

379 F.Supp. at 1018) that gives rise to antitrust liability.[23]

■ The defendants next assert that the district court's instruction providing that a "trade association is by its nature involved in concerted action" relieved the plaintiffs of proving one element of the § 1 violation, i.e., that the defendants engaged in a contract, combination or conspiracy. However, this segment of the entire jury instruction, as with any jury instruction, cannot be read in isolation. The district court initially instructed the jury that before a § 1 violation may be established a "conspiracy [must be proven to exist] among some or all of the defendants to collectively refuse without justifiable purpose ..." to purchase the Model 701. The district court later instructed:

"The issue here is whether plaintiffs have proved by a preponderance of the evidence that the defendants engaged in concerted action to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means and have, therefore, engaged in an unlawful combination or conspiracy."

Before the jury could find an unlawful conspiracy, the court required it to find that the defendants acted to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. In this case, the jury instruction given was consistent with the evidence presented at the trial. The only named defendants were the Association and its director, Mr. Reed. Concerted action was demonstrated in the Association membership's refusal to purchase the Model 701 after Reed's statement that the

---

**23.** We note that in *Broadcast Music Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979), the Court noted the importance of focusing attention on the purpose and effect of the practice before applying the *per se* rule of liability. The jury instructions in this case also instructed that liability should attach if the defendants acted with an anti-competitive purpose. The record indicates that the Model 701 was extremely favorably received by the purchasing segment of the industry after it was introduced. Although there was evidence of compliance problems with Model 701, the states

of California and Virginia, the only states that test these products, never revoked the plaintiffs' certificates. Wesbar, a competitor which sat on the trailer certification committee, submitted the reports to Reed challenging the Model 701 and based upon these reports, Reed made his damaging statement about the Model 701. Further, the record contains charges of tampering by misassembling the Model 701 samples submitted for testing. The resolution as to the accuracy of these charges is typically left to the jury. Thus, the record in this case certainly supports a finding of anti-competitive purpose.

Model 701 was not DOT approved and the follow-up Association's Technical Bulletin threatening revocation of its certificate of approval for any member using the Model 701. Reed briefly testified during the week-long trial that the Association threatened revocation of its certification in order to protect its members from any possible sanctions by federal authorities. This testimony was one of the Association's defenses and was reflected in the jury instruction that before liability could attach the defendants must have acted "without justifiable purpose."

Trade organizations, such as the Association, are formed to represent the interests of their members and when the members agree to establish a certification program, as was done in this case, in an attempt to regulate themselves and their industry, they do engage in concerted action.[24] Thus, after examining the jury instructions in light of the evidence presented at trial, we are not persuaded that the jury's understanding of the issues was so "seriously affected, to the prejudice" of the defendants to warrant a new trial. *Wilk*, 719 F.2d at 218–19.

### III.

The defendants next challenge both the manner in which the damage testimony was introduced, or the "ambush" as labelled by the defendants, and the sufficiency of the evidence supporting the plaintiffs' damage claim.

### A. Testimony Regarding Damage Claim.

Regarding the alleged "ambush," the defendants state that they propounded a set of interrogatories which required the plaintiffs to itemize their damage claim; however, the plaintiffs answered that they could not provide the requested information until further discovery took place on the damage issue. Subsequently, the defendants deposed the Moores on April 25 and April 26, 1978, concerning the opera-

tions of their business. Then on January 17, 1979 a "Final Pre-trial Order" was agreed upon by the parties wherein it provided in part that "plaintiffs submit no itemized list of special damages."

At trial, Dennis Moore testified as to the amount of Model 701 unit sales lost as a result of the Association's unlawful conduct by comparing the sales made to Association members during the twenty-four month period following the September 17, 1976 Association's meeting to an equivalent time for the twenty-four months following September, 1979. The Moores sold 30,657 sets of Model 701 lights during the 1979 to 1981 period. Moore also testified that the lost "after-market" sales, those additional sales spurred by the original sales to manufacturers, totaled approximately 21,000 pairs of lights. He then stated that the profit margin on direct sales to manufacturers was $2.78 per pair, while the profit margin on after-market sales was $3.82 per pair, this latter figure being larger because there is less price cutting in this market.

■ The defendants objected to the damage testimony presented by Dennis Moore, contending that it was an unfair surprise and thus prejudicial since the plaintiffs previously failed to notify the defendants of their claimed damages. The district court recognized and stated that under the circumstances Dennis Moore's testimony did put the defendants "under somewhat of a disadvantage." The district court, taking this into consideration, directed that the ledgers containing the sales figures be flown in from the plaintiffs' home office in California in order that the defendants might further depose Dennis Moore with this additional information at their disposal over the weekend during the trial. The district court also allowed the defendants to call Moore for later cross-examination after they had an ample opportunity to review and digest the sales figures. The defendants on appeal now assert that they were unduly prejudiced because the district

---

**24.** For example, in *Silver* liability was imposed where the only named defendant was the New York Stock Exchange. *See also, U.S. Trotting Ass'n,* 665 F.2d 781 (7th Cir.1981) where the only named defendant to the antitrust action was the USTA.

court allowed Dennis Moore to testify regarding the lost sales and profit figures, thereby violating the discovery rule 26(e)(2)(B) of the Fed.R.Civ.P. requiring that incomplete responses to earlier discovery requests be timely updated.[25] They also assert that this testimony violated the 1979 pre-trial order that stated "Plaintiffs submit no itemized list of special damages."

■ In evaluating the district court's response to a situation where a party has failed to update a response as required by Rule 26(e)(2)(B), we must determine whether the district court abused its discretion in allowing the evidence to be submitted to the jury.[26] *See, e.g., Bunch v. United States*, 680 F.2d 1271, 1280 (9th Cir.1982); *Scott & Fetzer Co. v. Dile*, 643 F.2d 670, 674 (9th Cir.1981); *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir.1979). In detailing the possible sanctions available to the district court where a party fails to timely supplement an answer to an interrogatory, the Advisory Committee Note to Rule 26(e) provides:

> "The duty will normally be enforced, in those limited instances where it is imposed, through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate."

The courts also have broad discretion in determining whether or not to impose sanctions in the first instance. Wright & Miller *Federal Practice and Procedure*, § 2050 at 326–27; *see also, LaBadie Coal Co. v. Black*, 672 F.2d 92, 95 (D.C.Cir.1982); *Murphy v. Magnolia Elec. Power Ass'n.*, 639 F.2d 232, 234–35 (5th Cir.1981). In determining whether the district court abused its discretion in allowing Dennis Moore to testify regarding his damages we must weigh the importance of the testimony and the adequacy of the remedy against the possible prejudice to the defendant. *Id.*, at 234–35; *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3d Cir.1978).

Obviously, Dennis Moore was extremely important to the plaintiffs' case since the evidence discloses that he was basically the plaintiffs' corporation management. Thus, he was the only one in a position to testify regarding the plaintiffs' damages.

Next, we must consider the adequacy of the remedy. There are two components to Dennis Moore's damage testimony. The first component concerns the price of the Model 701, while the second component concerns the number of lost unit sales. As to his testimony regarding the two profit margins, Dennis Moore testified that he arrived at these figures through a complex formula, taking into account material costs and depreciation, etc., and that this formula was not written down on paper since the management of his company was basically unsophisticated. The defendants claim that Moore's testimony was inherently prejudicial since they never had the opportunity to examine the underlying data upon which Moore based his profit calculations. However, Moore's testimony concerned his average profits during the period 1976 to 1978 when the Association members were not purchasing the Model 701. In spite of the fact that the defendants deposed Moore for two full days in April of 1978, they now

**25.** Fed.R.Civ.P. 26(e)(2)(B) provides:
"A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which ... (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment."

**26.** The text of Fed.R.Civ.P. 26(e)(2)(B) states that the duty to update a response only arises when the "circumstances are such that a failure to amend the response is in substance a knowing concealment." For purposes of this appeal, we will assume that Dennis Moore's testimony constituted "a knowing concealment" and thus Rule 26(e)(2)(B) was violated. Although, we note that the end of the plaintiffs' damage calculation period was September 30, 1981 and the trial in this case began during the first week of November, 1981. Thus, given the timing of the trial in relation to the damage calculation period, the circumstances of this case indicate that there may have been no such "knowing concealment." In fact, the plaintiffs contend that what the defendants really sought was their theory of damages; however, the Association did not specifically request this information.

claim that they were prejudiced by Moore's testimony. The defendants, however, were the parties asking the questions and thus it appears to us that they had ample opportunity to question Moore concerning the profit margin for these lights in order to establish a basis for challenging this testimony at trial. Further, when the district court ordered the plaintiffs to send for their sales records during the trial in an attempt to remedy the situation, the defendants failed to request any cost data.[27]

As to the quantity of the lost unit sales, obviously it was not possible to have these figures available at the time of the interrogatories in 1977 or the depositions taken in 1978. As just mentioned, the trial court did have this supporting information timely flown in from California and allowed George Moore to be deposed over the weekend during the trial. The defendants contend on appeal that this was simply not enough time to evaluate the figures. Even assuming that the totaling of unit sales and checking their veracity was in fact difficult, although computation of these figures would not appear to be very complicated, the record fails to reveal that the defendants even as much as requested a continuance of the trial for this purpose.[28] In this case, the district court arranged for the supporting data to be flown in during the trial, allowed further depositions to be taken, and allowed Moore to be further cross-examined at a later time during the trial. Obviously, the situation was not perfect as far as the defendants were concerned and

we are sure that the timing of the discovery may have put them at a disadvantage, but we have yet to review a record where the trial situation was the optimum of perfection in all respects. Thus, we hold that the district court's decision ordering that the supporting sales data be delivered to the defendants and allowing the mid-trial deposition of Moore, rather than excluding Dennis Moore's testimony concerning his damages, was not an abuse of discretion under the circumstances.

The defendants also contend that Dennis Moore's testimony violated the final pre-trial order stating that "plaintiffs submit no itemized list of special damages." This order was entered into on January 17, 1979, during the period when the Association members were still refusing to purchase the Model 701 and well before the plaintiffs had completed accumulating data for their damage claim. The term "special damages," given the adversarial nature of this case, is certainly subject to varying interpretations.[29] Here, the plaintiffs asserted antitrust elements for a product disparagement claim is that special damages must be proven. See Dobbs, *Remedies,* § 6.7 at 503.

Special damages are usually considered to be damages that naturally, but not necessarily, flow from the wrongful conduct of another, while general damages naturally and necessarily flow from the wrongful conduct. *See, e.g., M.F. Patterson Dental Supply Co. v. Wadley,* 401 F.2d 167, 172 (10th Cir.1968); *see also Pan-*

---

27. The defendants point to a statement made by Judge Moran ("I am less concerned really with how you got the profit figure because that certainly is something that can be explored") and argue that he considered the production of the cost data unnecessary. However, Judge Moran made this statement to Dennis Moore during an exchange between the court and Moore concerning his company's ledger unit sales records, during which time Moore also began discussing how he arrived at his profit margin. The judge's statement in no way could be construed as precluding the defendants from requesting these records.

28. Further, the defendants apparently claim that had they known of the damage claim theory

which the plaintiffs were pursuing, they could have deposed the members, such as E–Z Loader who made purchases of the Model 500 in 1978, and apparently offer contradictory testimony rebutting the plaintiff's damage claim. However, as the plaintiffs point out, the defendants asked about E–Z Loader during the plaintiffs' 1978 depositions. Further, in a pre-trial order the Association listed both the President and Vice-President of E–Z Loader as trial witnesses, but for some reason did not call them.

29. In fact, at trial while Moore was testifying the defense counsel objected and stated after referring to the pre-trial order, "[n]ow I am not intimating that these are special damages...." Tr. 254.

*tone v. Demos,* 59 Ill.App.3d 328, 16 Ill. Dec. 607, 375 N.E.2d 480, 486 (1978). Lost profits are considered to be general or direct damages in a breach of contract case, while they are considered to be special or indirect damages in a tort case. *D.P. Serv., Inc. v. AM Intern.,* 508 F.Supp. 162, 166–67 (N.D.Ill.1981); *Myers v. Stephens,* 233 Cal.App.2d 104, 43 Cal.Rptr. 420, 433 (1965). Since the plaintiffs alleged damages arising from both antitrust violations and the tort of commercial disparagement, it is possible that the plaintiffs were referring to the tort claim when they agreed to the language contained in the pre-trial order. However, if an antitrust violation is claimed, because of the nature of the injury, lost profits "necessarily" or directly flow from the violation where, as in this case, the Association's members refused to purchase the plaintiffs' Model 701. Further, any particularized listing of damages, which is required when a party claims special damages,[30] would be inconsistent with the rule in antitrust cases, as discussed later in this opinion, that the plaintiff need only demonstrate a "just and reasonable estimate" of his damages. *See Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Thus, since a particular list of damages need not be submitted in an antitrust action, we hold that the trial court's decision to admit Moore's testimony did not violate the 1979 pre-trial order.

**B. Legal Sufficiency of the Damage Claim.**

The defendants also challenge the plaintiffs' calculation of damages, contending that the evidence introduced at trial was legally insufficient to establish that the plaintiffs had been harmed. Specifically, the defendants assert that the plaintiffs' use of the "before and after" damage calculation method is improper because there was no showing made by the plaintiffs that conditions in the market during the two comparable time periods were similar. In fact, the Association contends that conditions were not similar as the plaintiffs cut the price of the Model 701 from $6.74 to $4.50 per pair to a major purchaser, E–Z Loader, and further that by the time the unlawful activity had ceased, the plaintiffs were distributing another model of the 701 with further refinements. The defendants also contend that Dennis Moore's testimony regarding the after-market sales is at best speculative and based upon conjecture and that his testimony regarding the average profit per light for both the direct and after-market sales is equally incompetent.

Before the plaintiffs can properly establish their damages, they are required to overcome two hurdles. Initially, the plaintiffs must prove the "fact" of injury, in other words, i.e., that the defendants' conduct was a material cause of some injury to the plaintiffs' business. *See, e.g., MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.1983); *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc.,* 527 F.2d 417, 418–20 (5th Cir.1976). Once the plaintiffs have established the fact of injury, the burden of proving the amount of damages is more relaxed. *See, e.g., MCI Communications,* 708 F.2d at 1161; *Jewel Tea Co. v. Local Union Nos. 189, 262, 320, 546, 547, 571 and 638 Amalgamated Meat Cutters & Butcher Workmen of North America, A.F.L.–C.I.O.,* 274 F.2d 217 (7th Cir.), *cert. denied,* 362 U.S. 936, 80 S.Ct. 757, 4 L.Ed.2d 757 (1960); J. von Kalinowski, *Antitrust Laws & Trade Regulation,* § 115.02[2] (1983). The traditional rule is that the plaintiff must only make a "just and reasonable estimate" of its damages. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

> "Each sale and the amount of loss on the transaction need not be shown; averages may be used to show that the plaintiff generally lost money over a period of

---

**30.** In fact, when a person claims special damages, because they do not necessarily flow from the wrongful conduct, an itemized list of those damages normally must be submitted to the court.

time ... and a non-expert's testimony regarding the past sales volume and profit margin may be used to measure damages ... the defendant is not relieved of liability just because the plaintiff does not show the exact volume and price figures possible within the damage period ... 'to hold otherwise would enable [the defendant] to profit by [its] wrongdoing at the expense of [its] victim.' "

*Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 858 (5th Cir.1981).

The Association contends that the conditions in the market were not similar between the two periods as evidenced by the plaintiffs' price cut in the Model 701. They apparently assert that the revival in sales was not due to the lifting of the certification ban, but rather was due to the plaintiffs' price-cutting to attract sales. The defendants cite *Pacific Coast Agr. Export Ass'n. v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), which stated:

"[P]laintiffs' method of measuring damages, known as the 'before and after' theory, may be used only where there has been some showing that the market conditions in the two periods were similar but for the impact of the violation. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259–63, 66 S.Ct. 574 [577–79], 90 L.Ed. 652 (1946)."

The *Pacific Coast* decision and our decision in *MCI Communications* reiterate that *Bigelow* allows a more lenient standard in calculating the amount of damages available only where causation or fact of damage is established:

"[I]n the absence of more precise proof, the jury could [infer] from the 'proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes,*' that defend-

ants' wrongful acts had caused damage to the plaintiffs."

*MCI Communications*, 708 F.2d at 1161, *quoting Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579. Causation of an antitrust injury was clearly established in this case. "But for" the Association's conduct, we are convinced that the sales of the Model 701 would not have declined.

■ During the period September 1976 to September 1978 the plaintiffs alleged that they suffered lost sales of approximately 31,000 pairs of lights to Association members. The defendants claim that this number is artificially high because part of the increase in sales was due to the plaintiffs' price cuts. However, Dennis Moore testified that prices were reduced only because Association members were buying in increased quantity, and thus it was less expensive to manufacture, package and ship the product at the higher volume. Whatever the reason for the increased sales, the plaintiffs' theory is apparently that if it were not for the Association's conduct, these unit sales made during the 1979 to 1981 period would have been the sales made during the 1976 to 1978 period,[31] and because of the defendants' conduct the possibility of these sales being made was forever lost. Where *Pacific Coast* refers to "some showing that the market conditions in the two periods [before and after] were similar but for the impact of the violation, ..." (*Pacific Coast Agr. Export Ass'n.*, 526 F.2d at 1206–07), the "after" period apparently refers to those conditions that did or did not exist during the "before" period such that doubt would be cast upon the validity of the claimed lost sales figures. For example, if there was a recession in the particular industry from 1976 to 1979 and an economic boom from 1979 to 1981, such that sales during the latter period would not accurately reflect the possible sales that could have been made during the earlier period, a comparison may have been improper. But in this case, if the plaintiffs had been able to make the sales during the 1976 to 1978 period, even assuming those

---

31. For example, if it were not for the defendants' conduct, sales during 1976, 1977 and 1978

would have been 1,042 pair, 6,188 pair, and 25,246 pair, respectively. *See* note 10.

sales were spurred by a price cut, the fact is that the plaintiffs were not able to make the sales because of the defendants' conduct and thus the opportunity was lost.[32] Simply because the plaintiffs did cut their prices during the 1979 to 1981 period does not convince us that the markets were not similar so as to preclude any comparison.

The defendants also challenge Dennis Moore's testimony regarding the after-market unit sales and the profit margin on those sales as equally incompetent and unpersuasive. Certainly, Dennis Moore was competent to testify regarding the calculation of the profit margin, especially since he was essentially a one-man "management team" and, thus, was the only possible person who could testify as to this matter. *See, e.g., Malcolm v. Marathon Oil Co.,* 642 F.2d 845 (5th Cir.1981) (Malcolm, the proprietor of a retail gas station, was allowed to testify concerning the damages caused by the defendants' unlawful conduct). As to the defendants' claim that Dennis Moore's testimony regarding after-market sales of the Model 701 lights was speculative, we note that the plaintiffs may rely on probability and inference in establishing their estimate of the damages incurred. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931); *see also Bigelow,* 327 U.S. at 265, 66 S.Ct. at 580 ("[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"). It is certainly logical to assume that additional unit sales to dealers were lost because the Association's members were not purchasing the Model 701 light. Further,

Dennis Moore testified that he had over ten years experience in running his business. Thus, he was certainly qualified to estimate the amount of lost unit sales in the after-market caused by the Association's conduct. Because the figures presented by the plaintiffs were neither remote nor unreasonable, we hold that it was proper for the district court to allow Dennis Moore to testify as to the lost unit sales in the after-market.

We thus hold that the plaintiff Dennis Moore's testimony regarding his profit margin and lost unit sales was admissible and competent in establishing the $167,202 in damages.

### IV.

The decision of the district court is affirmed.[33]

---

**32.** The defendants also did not directly argue to the jury, nor do they argue now, that the price cut also reduced the Model 701's profit margin. Further, the jury was free to believe Dennis Moore's testimony that the increased volume allowed him to reduce his prices since it decreased his production costs.

The defendants also argue that any comparison between the periods 1976 to 1978 and 1979 to 1981 is improper because the plaintiffs were selling a third version of the Model 701 during the later period. We find this argument unpersuasive. The jury was free to find that it was

the lifting of the threat to revoke the members' certificates of approval, and not the fact that the plaintiffs' were selling another model of the 701, that caused the increased sales during the period 1979 to 1981.

**33.** Because we have affirmed the jury verdict and the district court's denial of a judgment n.o.v. on the issue of antitrust liability, we need not address the plaintiffs' assertion that the district court erred in granting judgment n.o.v. on the common law and Illinois statutory commercial disparagement claims.